**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 10 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____

ATLAS TELEPHONE COMPANY;
BEGGS TELEPHONE COMPANY;
BIXBY TELEPHONE COMPANY;
CANADIAN VALLEY TELEPHONE
COMPANY; CARNEGIE TELEPHONE
COMPANY; CENTRAL OKLAHOMA
TELEPHONE COMPANY; CHEROKEE
TELEPHONE COMPANY;
CHICKASAW TELEPHONE
COMPANY; CHOUTEAU TELEPHONE
COMPANY; CIMARRON TELEPHONE
COMPANY; CROSS TELEPHONE
COMPANY; DOBSON TELEPHONE
COMPANY; GRAND TELEPHONE
COMPANY; HINTON TELEPHONE
COMPANY; KANOKLA TELEPHONE
ASSOCIATION; MCLOUD
TELEPHONE COMPANY; MEDICINE
PARK TELEPHONE COMPANY;
OKLAHOMA TELEPHONE &
TELEGRAPH; OKLAHOMA
WESTERN TELEPHONE COMPANY;
PANHANDLE TELEPHONE
COOPERATIVE INC.; PINE
TELEPHONE COMPANY; LAVACA
TELEPHONE COMPANY, doing
business as Pinnacle Communications;
PIONEER TELEPHONE
COOPERATIVE INC.;
POTTAWATOMIE TELEPHONE
COMPANY; SALINA-SPAVINAW
TELEPHONE COMPANY; SANTA
ROSA TELEPHONE COOPERATIVE

No. 04-6096

INC.; SHIDLER TELEPHONE
COMPANY; SOUTH CENTRAL
TELEPHONE ASSOCIATION, INC.;
SOUTHWEST OKLAHOMA
TELEPHONE COMPANY; TERRAL
TELEPHONE COMPANY; TOTAH
TELEPHONE COMPANY INC.;
VALLIANT TELEPHONE COMPANY,

Plaintiffs - Appellants,

v.

OKLAHOMA CORPORATION
COMMISSION; DENISE A. BODE;
BOB ANTHONY; JEFF CLOUD,
Corporation Commissioners in their
official capacities,

Defendants,

and

AT&T WIRELESS SERVICE, Inc.,

Defendant - Appellee.

ATLAS TELEPHONE COMPANY;
BEGGS TELEPHONE COMPANY;
BIXBY TELEPHONE COMPANY;
CANADIAN VALLEY TELEPHONE
COMPANY; CARNEGIE TELEPHONE
COMPANY; CENTRAL OKLAHOMA
TELEPHONE COMPANY; CHEROKEE
TELEPHONE COMPANY;
CHICKASAW TELEPHONE
COMPANY; CHOUTEAU TELEPHONE
COMPANY; CIMARRON TELEPHONE

No. 04-6098

2

COMPANY; CROSS TELEPHONE COMPANY; DOBSON TELEPHONE COMPANY; GRAND TELEPHONE COMPANY; HINTON TELEPHONE COMPANY; KANOKLA TELEPHONE ASSOCIATION; MCLOUD TELEPHONE COMPANY; MEDICINE PARK TELEPHONE COMPANY; OKLAHOMA TELEPHONE & TELEGRAPH; OKLAHOMA WESTERN TELEPHONE COMPANY; PANHANDLE TELEPHONE COOPERATIVE INC.; PINE TELEPHONE COMPANY; LAVACA TELEPHONE COMPANY, doing business as Pinnacle Communications; PIONEER TELEPHONE COOPERATIVE INC.; POTTAWATOMIE TELEPHONE COMPANY; SALINA-SPAVINAW TELEPHONE COMPANY; SANTA ROSA TELEPHONE COOPERATIVE INC.; SHIDLER TELEPHONE COMPANY; SOUTH CENTRAL TELEPHONE ASSOCIATION, INC.; SOUTHWEST OKLAHOMA TELEPHONE COMPANY; TERRAL TELEPHONE COMPANY; TOTAH TELEPHONE COMPANY INC.; VALLIANT TELEPHONE COMPANY,

Plaintiffs - Appellants,

v.

OKLAHOMA CORPORATION COMMISSION; DENISE A. BODE; BOB ANTHONY; JEFF CLOUD, Corporation Commissioners, in their

3

official capacities; SOUTHWESTERN BELL WIRELESS INC., doing business as Cingular Wireless LLC, Oklahoma RSA 3 Limited Partnership, Oklahoma RSA 9 Limited Partnership, Oklahoma City SMSA Limited Partnership,

Defendants - Appellees.

ATLAS TELEPHONE COMPANY; BEGGS TELEPHONE COMPANY; BIXBY TELEPHONE COMPANY; CANADIAN VALLEY TELEPHONE COMPANY; CARNEGIE TELEPHONE COMPANY; CENTRAL OKLAHOMA TELEPHONE COMPANY; CHEROKEE TELEPHONE COMPANY; CHICKASAW TELEPHONE COMPANY; CHOUTEAU TELEPHONE COMPANY; CIMARRON TELEPHONE COMPANY; CROSS TELEPHONE COMPANY; DOBSON TELEPHONE COMPANY; GRAND TELEPHONE COMPANY; HINTON TELEPHONE COMPANY; KANOKLA TELEPHONE ASSOCIATION; MCLOUD TELEPHONE COMPANY; MEDICINE PARK TELEPHONE COMPANY; OKLAHOMA TELEPHONE & TELEGRAPH; OKLAHOMA WESTERN TELEPHONE COMPANY; PANHANDLE TELEPHONE COOPERATIVE INC.; PINE TELEPHONE COMPANY; LAVACA TELEPHONE COMPANY, doing business as Pinnacle Communications; PIONEER TELEPHONE COOPERATIVE INC.;

No. 04-6100

4

POTTAWATOMIE TELEPHONE
COMPANY; SALINA-SPAVINAW
TELEPHONE COMPANY; SANTA
ROSA TELEPHONE COOPERATIVE
INC.; SHIDLER TELEPHONE
COMPANY; SOUTH CENTRAL
TELEPHONE ASSOCIATION, INC.;
SOUTHWEST OKLAHOMA
TELEPHONE COMPANY; TERRAL
TELEPHONE COMPANY; TOTAH
TELEPHONE COMPANY INC.;
VALLIANT TELEPHONE COMPANY,

    Plaintiffs - Appellants,

v.

OKLAHOMA CORPORATION
COMMISSION; DENISE A. BODE,
BOB ANTHONY, JEFF CLOUD,
Corporation Commissioners in their
official capacities; WWC LICENSE LLC,

    Defendants - Appellees.

_____

ATLAS TELEPHONE COMPANY;
BEGGS TELEPHONE COMPANY;
BIXBY TELEPHONE COMPANY;
CANADIAN VALLEY TELEPHONE
COMPANY; CARNEGIE TELEPHONE
COMPANY; CENTRAL OKLAHOMA
TELEPHONE COMPANY; CHEROKEE
TELEPHONE COMPANY;
CHICKASAW TELEPHONE
COMPANY; CHOUTEAU TELEPHONE
COMPANY; CIMARRON TELEPHONE
COMPANY; CROSS TELEPHONE
COMPANY; DOBSON TELEPHONE

No. 04-6101

5

COMPANY; GRAND TELEPHONE COMPANY; HINTON TELEPHONE COMPANY; KANOKLA TELEPHONE ASSOCIATION; MCLOUD TELEPHONE COMPANY; MEDICINE PARK TELEPHONE COMPANY; OKLAHOMA TELEPHONE & TELEGRAPH; OKLAHOMA WESTERN TELEPHONE COMPANY; PANHANDLE TELEPHONE COOPERATIVE INC.; PINE TELEPHONE COMPANY; LAVACA TELEPHONE COMPANY, doing business as Pinnacle Communications; PIONEER TELEPHONE COOPERATIVE INC.; POTTAWATOMIE TELEPHONE COMPANY; SALINA-SPAVINAW TELEPHONE COMPANY; SANTA ROSA TELEPHONE COOPERATIVE INC.; SHIDLER TELEPHONE COMPANY; SOUTH CENTRAL TELEPHONE ASSOCIATION, INC.; SOUTHWEST OKLAHOMA TELEPHONE COMPANY; TERRAL TELEPHONE COMPANY; TOTAH TELEPHONE COMPANY INC.; VALLIANT TELEPHONE COMPANY,

      Plaintiffs - Appellants,

v.

OKLAHOMA CORPORATION COMMISSION; DENISE A. BODE; BOB ANTHONY; JEFF CLOUD, Corporation Commissioners in their official capacities; SPRINT SPECTRUM LIMITED PARTNERSHIP, d/b/a Sprint

PCS,

Defendants - Appellees.

---

**APPEALS FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 03-CV-347-F)**

---

Kendall W. Parrish (Ron Comingdeer, Mary Kathryn Kunc, David W. Lee, and Ambre C. Gooch, Comingdeer, Lee & Gooch, Oklahoma City, Oklahoma, and Kimberly K. Brown, Kimberly K. Brown, P.C., Oklahoma City, Oklahoma, with him on the briefs), Comingdeer, Lee & Gooch, Oklahoma City, Oklahoma for Plaintiffs-Appellants.

Phillip R. Schenkenberg (Michael G. Harris and William H. Hickman, Moricoli Harris & Cottingham, Oklahoma City, Oklahoma, with him on the brief), Briggs and Morgan, P.A., Saint Paul, Minnesota, for Defendant-Appellee WWC License L.L.C.

Marc Edwards and Jennifer Kirkpatrick, Phillips McFall McCaffrey McVay & Murrah, P.C., Oklahoma City, Oklahoma, and Lawrence S. Smith, Smith, Majcher & Mudge, L.L.P., Austin, Texas, on the brief for Defendant-Appellee AT&T Wireless Services, Inc.

John Paul Walters, Jr., Edmond, Oklahoma, on the brief for Defendant-Appellee Cingular Wireless.

Brett Leopold, Sprint Spectrum, L.P., Overland Park, Kansas, on the brief for Defendant-Appellee Sprint Spectrum, L.P., d/b/a Sprint PCS.

---

Before **KELLY, ANDERSON** and **O'BRIEN,** Circuit Judges.

---

**KELLY,** Circuit Judge.

---

In these consolidated appeals, Plaintiffs-Appellants rural telephone companies

("RTCs") collectively appeal the district court's orders affirming final orders of the Oklahoma Corporation Commission ("OCC"). The OCC orders established interconnection obligations under the federal Telecommunications Act of 1996 between the RTCs and Defendant-Appellees commercial mobile radio service ("CMRS") providers. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

Background

The RTCs are traditional landline telecommunications carriers doing business in Oklahoma. CMRS providers are wireless telecommunications carriers. This dispute arose from negotiations for interconnection agreements between the RTCs and CMRS providers.

The Telecommunications Act of 1996 ("Telecommunications Act" or "Act"), 47 U.S.C. §§ 151–614, opened the previously monopolized telecommunications industry to competition. Under the Act, local exchange carriers ("LECs"),[1] like the RTCs, have a duty to interconnect with competitors and negotiate agreements in good faith. 47 U.S.C. §§ 251(a)(1), (c)(1). In the instant cases, the RTCs and CMRS providers resolved many outstanding issues during voluntary negotiations entered into pursuant to § 252(a)(1) of the Act. However, negotiations broke down over compensation for the transport and termination of telecommunications traffic. The CMRS providers subsequently filed

---

[1] An LEC is defined in the Act as "any person that is engaged in the provision of telephone exchange service or exchange access." 47 U.S.C. § 153(26) (excluding CMRS providers from the definition).

petitions with the OCC seeking arbitration of the contested issues pursuant to § 252(b)(1) of the Act.

The parties raised numerous issues before the OCC-appointed arbitrator. Relevant here, the RTCs and CMRS providers disputed the compensation regime that would apply to the transport and termination of telecommunications between the parties' networks. Under the terms of the interconnection agreements, the CMRS providers were not required to establish physical connections with the RTC networks, although the agreements do not preclude such connections. Rather, telecommunications traffic could be routed through an interexchange carrier ("IXC"), Southwestern Bell Telephone Company ("SWBT"). When an RTC customer places a call to a CMRS customer, the call must first pass from the RTC network through a point of interconnection with the SWBT network. SWBT then routes the call to a second point of interconnection between its network and the CMRS network. The call is then delivered to the CMRS customer.[2] In contrast, were the RTC and CMRS networks directly connected, the call would pass only through a single point of interconnection.

The CMRS providers maintained that, regardless of the presence of the IXC, the telecommunications exchange referenced above is subject to the reciprocal compensation obligations found in § 251(b)(5) of the Act. The Federal Communications Commission

---

[2]The converse is true for calls originated by a CMRS customer and delivered to an RTC customer.

9

("FCC"), charged with effectuating the provisions of the Act, has determined that reciprocal compensation should only apply to telecommunications traffic originating and terminating in the same local area. First Report and Order, FCC 96-325, CC Docket Nos. 96-98, 95-185, ¶ 1034 (Aug. 8, 1996) ("First Report and Order"). Under a typical reciprocal compensation agreement between two carriers, the carrier on whose network the call originates bears the cost of transporting the telecommunications traffic to the point of interconnection with the carrier on whose network the call terminates. Id. Having been compensated by its customer, the originating network in turn compensates the terminating carrier for completing the call. Id. In contrast, the RTCs maintained that traffic passing through an IXC is subject to the access charge, or long-distance calling, regime. Under the access charge regime, the originating caller pays the IXC, which in turn compensates the originating and terminating networks. Id. Thus, the RTCs contend that they have no obligation to compensate CMRS providers for transporting and terminating such traffic.

In the context of the instant cases, the difference between the compensation schemes is more than semantic. Under these reciprocal compensation agreements, the originating network bears the cost of transporting telecommunications traffic across SWBT's network to the point of interconnection with the terminating network. The originating network is then required to compensate the terminating network for terminating the call. Under the Act, reciprocal compensation is based solely on the costs

10

of transport and termination incurred by the terminating provider. 47 U.S.C. § 252(d)(2)(A). In contrast, under the access charge regime, both the originating and terminating carriers would be compensated by the IXC. Under this scenario, neither carrier bears the cost of transporting traffic on the IXC network.

Excepting traffic to or from a CMRS provider, state commissions are responsible for determining what areas are local for purposes of applying the reciprocal compensation obligation found in § 251(b)(5). First Report and Order ¶ 1035. However, the FCC has determined that "traffic to or from a CMRS network that originates and terminates within the same [Major Trading Area] is subject to transport and termination rates under section 251(b)(5), rather than interstate and intrastate access charges." Id. ¶ 1036. A major trading area ("MTA") is the largest FCC-authorized wireless license territory, and might encompass all or part of numerous state-defined local calling areas. Id. Relying on this FCC determination, the OCC-appointed arbitrator determined that reciprocal compensation would apply to agreements between the RTCs and CMRS providers in the instant cases. The OCC subsequently approved provisions in the arbitrated agreements reflecting this determination.

In addition, and solely with respect to Defendant-Appellee WWC License L.L.C. ("Western Wireless"), the arbitrator determined that Western Wireless should have the option under the agreements to establish local numbers without establishing direct connections with the RTCs. This determination resulted in a provision under the OCC-

11

approved interconnection agreement requiring an RTC to deliver calls to Western Wireless at a SWBT switch.

On completion of the arbitration, the conformed agreements were submitted to and approved by the OCC. The RTCs initially appealed the OCC orders approving the interconnection agreements to the Oklahoma Supreme Court, but their suit was dismissed for lack of jurisdiction. The RTCs then brought suit in federal district court. In its first order and judgment, the district court affirmed various aspects of the OCC orders, including the determination that compensation for the transport and termination of telecommunications would be reciprocal. Atlas Tel. Co. v. Corp. Comm'n of Okla., 309 F. Supp. 2d 1299, 1309-10 (W.D. Okla. 2004) ("Atlas I"). In its second order and judgment, the district court affirmed that part of the OCC's final order approving the provision in the interconnection agreement that requires an RTC to deliver calls to Western Wireless at a SWBT switch. Atlas Tel. Co. v. Corp. Comm'n of Okla., 309 F. Supp. 2d 1313, 1316-17 (W.D. Okla. 2004) ("Atlas II").

<u>Issues on Appeal</u>

In Nos. 04-6096, 04-6098, and 04-6101, the RTCs challenge that portion of Atlas I affirming the OCC's determination "that reciprocal compensation obligations apply to all calls originated by an RTC and terminated by a wireless provider within the same major trading area, without regard to whether those calls are delivered via an intermediate

12

carrier." 309 F. Supp. 2d at 1310. The RTCs contend that the holding is contrary to both the Telecommunications Act and FCC regulations. In No. 04-6100, the RTCs reiterate the foregoing and further challenge the district court's determination that the Act does not require competing carriers to interconnect physically with the LEC's network as contrary to the express language of the statute and FCC regulations. Atlas II, 309 F. Supp. 2d at 1317.

Discussion

I.      Standard of Review

The issues raised by the RTCs in the instant cases are purely legal. As such, we will conduct a de novo review to determine whether the interconnection agreements, as approved by the OCC, comply with the requirements of the Act and federal regulations implementing its statutory provisions. Southwestern Bell Tel. Co. v. Brooks Fiber Communications of Okla., Inc., 235 F.3d 493, 498 (10th Cir. 2000). However, we note that the RTCs have not challenged the validity of the various FCC regulations at issue in this case. Thus, we have not been asked to undertake, nor will we engage in, a reasonableness inquiry concerning those determinations. See Chevron U.S.A, Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984).

II.     The Statutory Scheme

Section 251 of the Act establishes a three-tier system of obligations imposed on separate, statutorily defined telecommunications entities. Pac. Bell v. Cook Telecom,

13

Inc., 197 F.3d 1236, 1237-38 (9th Cir. 1999); Competitive Telecomms. Ass'n v. FCC, 117 F.3d 1068, 1071 (8th Cir. 1997). Section 251(a) obligates each "telecommunications carrier"[3] "to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers." 47 U.S.C. § 251(a)(1). Under Section 251(b), the more limited class of "local exchange carriers"[4] is obligated to, among other things, "establish reciprocal compensation arrangements for the transport and termination of telecommunications." Id. § 251(b)(5). Finally, § 251(c) imposes additional obligations on "incumbent local exchange carriers" ("ILECs").[5] For instance, ILECs have the duty to negotiate in good faith interconnection agreements that comply with the obligations in §§ 251(b)-(c). Id. § 251(c)(1). ILECs also bear the statutory duty to "provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the [ILEC's] network." Id. § 251(c)(2). Such interconnection must be provided "at any technically feasible point within the [ILEC's] network," id. § 251(c)(2)(B), and "on

---

[3]"Telecommunications carrier" is defined as "any provider of telecommunications services." 47 U.S.C. § 153(44). "Telecommunications service" is in turn defined as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." Id. § 153(46). The FCC has determined that CMRS providers qualify as "telecommunications carriers," and thus are subject to the provisions of § 251(a). First Report and Order ¶ 1012.

[4]See supra note 1.

[5]"Incumbent local exchange carriers" are defined in the Act as certain dominant carriers that provided telephone exchange service on February 8, 1996. See 47 U.S.C. § 251(h)(1).

14

rates, terms, and conditions that are just, reasonable, and nondiscriminatory." Id. § 251(c)(2)(D).

Recognizing that implementation of the pro-competitive provisions of the Act would not be instantaneous, Congress included language to ensure that certain exchange access and interconnection requirements would continue to be enforced after passage of the statute.

> On and after February 8, 1996, each local exchange carrier, to the extent that it provides wireline services, shall provide exchange access, information access, and exchange services for such access to interexchange carriers and information service providers in accordance with the same equal access and nondiscriminatory interconnection restrictions and obligations (including receipt of compensation) that apply to such carrier on the date immediately preceding February 8, 1996 . . . until such restrictions and obligations are explicitly superseded by regulations prescribed by the Commission after February 8, 1996.

Id. § 251(g). As the United States Court of Appeals for the District of Columbia Circuit has explained, § 251(g) is a transitional provision designed to keep in place certain restrictions and obligations, including the existing access charge regime, until such provisions are superceded by FCC regulations. WorldCom, Inc. v. FCC, 288 F.3d 429, 432-33 (D.C. Cir. 2002).

Finally, in defining the parameters for reciprocal compensation under § 251(b)(5), Congress mandated that the terms and conditions for such compensation must "provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the

15

network facilities of the other carrier." 47 U.S.C. § 252(d)(2)(A)(i). However, Congress clearly indicated that it did not seek to preclude "arrangements that waive mutual recovery (such as bill-and-keep arrangements)." Id. § 252(d)(2)(B)(i).

III.     FCC Implementation

In its First Report and Order, the FCC made several determinations that bear directly on these consolidated cases. While declining to treat CMRS providers as LECs, and thus subject to the obligations imposed under §§ 251(b)-(c), the FCC expressly determined that LECs are obligated under § 251(b)(5) to enter into reciprocal compensation arrangements with CMRS providers. First Report and Order ¶ 1006, 1008. Furthermore, the Commission determined that "[i]ncumbent LECs are required to provide interconnection to CMRS providers who request it for the transmission and routing of telephone exchange service or exchange access, under the plain language of section 251(c)(2)." Id. ¶ 1015.

In determining the scope of the § 251(b)(5) obligation, the FCC concluded that "reciprocal compensation obligations should apply only to traffic that originates and terminates within a local area." Id. ¶ 1034. With respect to LEC-LEC communication, the FCC determined that state commissions retained the authority to define "local area" for the purpose of applying the § 251(b)(5) obligation. Id. ¶ 1035. However, the Commission defined the local area for LEC-CMRS communication as coterminous with the MTA, the largest Commission-authorized wireless territory. Id. ¶ 1036. The FCC

16

explained that "traffic to or from a CMRS network that originates and terminates within the same MTA is subject to transport and termination rates under section 251(b)(5), *rather than interstate and intrastate access charges*." Id. (emphasis added).

These FCC determinations have since been codified as regulations binding on the industry and state commissions. Relevant here, 47 C.F.R. § 51.305 details an ILEC's obligation under § 251(c)(2) of the Act to provide for interconnection with requesting carriers and identifies technically feasible points of interconnection on the ILEC's network. With respect to reciprocal compensation requirements, the regulations further provide that "[e]ach LEC shall establish reciprocal compensation arrangements for transport and termination of telecommunications traffic with any requesting telecommunications carrier." 47 C.F.R. § 51.703(a). For purposes of applying the requirement in section 51.703, "telecommunications traffic" is defined in relevant part as that "exchanged between a LEC and a CMRS provider that, at the beginning of the call, originates and terminates within the same Major Trading Area." Id. § 51.701(b)(2). Finally, "transport" in the context of reciprocal compensation obligations is defined as "the transmission and any necessary tandem switching of telecommunications traffic subject to section 251(b)(5) of the Act from the interconnection point between the two carriers to the terminating carrier's end office switch that directly serves the called party, or equivalent facility provided by a carrier other than an [ILEC]." Id. § 51.701(c).

17

IV.    Appellants' Common Issue – Inconsistency Between the Agreements and the Act

and Federal Regulations

We construe the RTCs' briefs in these consolidated cases as raising a single

common issue alleging inconsistency between the interconnection agreements and the

plain language of the Act, the First Report and Order, and the relevant regulations.[6]  This

issue roughly corresponds to that treated by the district court in part II.B of its order and

judgment in Atlas I.  309 F. Supp. 2d at 1309-10.  We treat the issue unique to No. 04-

6100, the "Western Wireless Issue," separately below.

We begin, as we must, with the plain language of 47 U.S.C. § 251(b)(5)[7] and its

regulatory counterpart 47 C.F.R. § 51.703(a).[8]  In no uncertain terms, both provisions

impose a duty on LECs to establish reciprocal compensation arrangements with

requesting carriers.  We next turn to 47 C.F.R. § 51.701(b)(2), a regulatory provision that

_____

[6]In so doing, we necessarily reject the CMRS providers' contention that the RTCs failed to preserve an issue, that the Act and FCC regulations require carriers to exchange local traffic through a point of interconnection within the ILEC's network, by asserting it before the district court.  See Mauldin v. Worldcom, Inc., 263 F.3d 1205, 1210 n.1 (10th Cir. 2001).  There is a difference, albeit subtle, between arguing that CMRS providers are required to interconnect directly with the ILECs and arguing that the exchange must occur within the ILEC's network.  The latter argument was raised in the district court, Aple. Supp. App. at 81-82, and accordingly we consider it.

[7]LECs have "[t]he duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications."  47 U.S.C. § 251(b)(5).

[8]"Each LEC shall establish reciprocal compensation arrangements for transport and termination of telecommunications traffic with any requesting telecommunications carrier."  47 C.F.R. § 51.703(a).

18

both gives effect to and narrows the LECs' obligation. Regulation 51.701(b)(2) defines "telecommunications traffic" subject to reciprocal compensation as, in relevant part, that "exchanged between a LEC and a CMRS provider that, at the beginning of the call, originates and terminates within the same [MTA]." 47 C.F.R. § 51.701(b)(2).

We hold that the mandate expressed in these provisions is clear, unambiguous, and on its face admits of no exceptions. The RTCs in the instant case have a mandatory duty to establish reciprocal compensation agreements with the CMRS providers, see Qwest Corp. v. FCC, 258 F.3d 1191, 1200 (10th Cir. 2001) (noting that the term "shall" connotes a mandatory, as opposed to permissive, requirement), for calls originating and terminating within the same MTA. Where the regulations at issue are unambiguous, our review is controlled by their plain meaning. In re Sealed Case, 237 F.3d 657, 667 (D.C. Cir. 2001). Nothing in the text of these provisions provides support for the RTC's contention that reciprocal compensation requirements do not apply when traffic is transported on an IXC network.

Our reading of the plain language of the relevant statutory and regulatory provisions is further supported by the FCC's definition of "telecommunications traffic" in the context of landline-to-landline exchange in the same regulations. See 47 C.F.R. § 51.703(b)(1). Regulation 51.701(b)(1) specifically excludes from reciprocal compensation requirements landline traffic exchanged between a LEC and a non-CMRS carrier "that is *interstate or intrastate exchange access*" in nature. Id. § 51.701(b)(1)

19

(emphasis added). Significantly, the Commission did not carry foward that same exception into regulation 51.701(b)(2), the operative definition in this case. We agree with the district court's conclusion that the FCC was undoubtedly aware of issues arising when access calls are exchanged, yet chose not to extend a similar exception to LEC-CMRS traffic. Atlas I, 309 F. Supp. 2d at 1310. When in exercising its quasi-legislative authority an agency includes a specific term or exception in one provision of a regulation, but excludes it in another, we will not presume that such term or exception applies to provisions from which it is omitted. Cf. Russello v. United States, 464 U.S. 16, 23 (1983) (noting that when Congress so acts, courts will presume that the exclusion was intentional).

We are not persuaded by the RTCs' arguments that our interpretation creates tension or is inconsistent with other FCC regulations and provisions of the Act. The RTCs first contend that 47 U.S.C. § 251(c)(2) mandates that the exchange of local traffic occur at specific, technically feasible points within an RTC's network,[9] and that this duty is separate and distinct, though no less binding on interconnecting carriers, from the reciprocal compensation arrangements mandated by § 251(b)(5). We simply find no support for this argument in the text of the statute or the FCC's treatment of the statutory

---

[9]In this instance, the RTCs do not argue that the CMRS providers must directly connect to their networks. Rather, the essence of their argument is that RTCs cannot be forced to bear the additional expense of transporting traffic bound for a CMRS provider across the SWBT network. Under their interpretation, RTCs are only responsible for transport to a point of interconnection on their own network.

20

provisions. Section 251(c)(2) imposes a duty on the *ILECs* to provide physical interconnection with *requesting* carriers at technically feasible points within the RTCs' networks. By its terms, this duty *only* extends to ILECs and is *only* triggered on request.[10]

The fallacy of the RTCs' argument is demonstrated in a number of ways. The RTCs contend that the general requirement imposed on all carriers to interconnect "directly or *indirectly*," 47 U.S.C. § 251(a) (emphasis added), is superceded by the more specific obligations under § 251(c)(2). Yet, as noted above, the obligation under § 251(c)(2) applies only to the far more limited class of ILECs, as opposed to the obligation imposed on all telecommunications carriers under § 251(a). The RTCs' interpretation would impose concomitant duties on both the ILEC and a *requesting* carrier. This contravenes the express terms of the statute, identifying only ILECs as entities bearing additional burdens under § 251(c). We cannot conclude that such a provision, embracing only a limited class of obligees, can provide the governing framework for the exchange of local traffic.

We also find that the RTCs' interpretation of § 251(c)(2) would operate to thwart the pro-competitive principles underlying the Act. Although § 251(c)(2) interconnection is only triggered by request, the RTCs would make such interconnection obligatory to all

---

[10]According to testimony of OCC Public Utility Division analyst Lillie R. Simon before the OCC-appointed arbitrator, such a request is typically made when the volume of traffic passing between two carriers makes physical interconnection economically feasible. I App. at 216.

carriers seeking to exchange local traffic. At the same time, however, the Act exempts RTCs from the application of § 251(c) until a request is made and the appropriate "State commission determines . . . that such request is not unduly economically burdensome, is technically feasible, and is consistent [with other provisions of the Act]." Id. § 251(f)(1)(A). If Congress had intended § 251(c)(2) to provide the sole governing means for the exchange of local traffic, it seems inconceivable that the drafters would have simultaneously incorporated a rural exemption functioning as a significant barrier to the advent of competition. In sum, accepting the RTCs' interpretation of § 251(c) would compel us to assume too much and ignore altogether the express language of the statute.[11]

The RTCs' next argument, in various permutations, is that the local traffic at issue here qualifies as exchange access traffic because it transits the IXC network. In that historical exchange access requirements continue in force even after passage of the Telecommunications Act, 47 U.S.C. § 251(g), the RTCs argue that such requirements yet apply when calls are transported across the IXC network. In support, the RTCs point to various statements by the FCC in its First Report and Order limiting the scope of reciprocal compensation requirements under the Act.

In the First Report and Order, the FCC limited application of reciprocal

---

[11]Because we hold that 47 U.S.C. § 251(c)(2) does not govern interconnection for the purposes of local exchange traffic, the RTCs' argument that CMRS providers must bear the expense of transporting RTC-originated traffic on the SWBT network must fail. The pricing standards established under 47 U.S.C. § 252(d)(1) by their terms only apply in the context of interconnection under § 251(c)(2).

22

compensation requirements to traffic originating and terminating within a local area.

First Report and Order ¶ 1034. In so doing, the Commission determined that reciprocal compensation obligations "do not apply to the transport or termination of interstate or intrastate interexchange traffic." Id. While this statement might be read to preclude reciprocal compensation in the instant case, we conclude that the FCC did not intend such a bar to apply in the context of LEC-CMRS traffic. First, in describing the interexchange traffic at issue, it is clear that the FCC had in mind the traditional setting of landline-to-landline calls. The Commission illustrated the traffic at issue by pointing to an LEC-IXC-LEC exchange, this after previously declining to treat CMRS providers as LECs. While this distinction is not dispositive, we note it as relevant. Second, and most significant, the FCC subsequently determined that "traffic to or from a CMRS network that originates and terminates within the same MTA is subject to transport and termination rates under section 251(b)(5), *rather than interstate and intrastate access charges*." Id. § 1036. Although in a preceding paragraph, Id. ¶ 1035, the FCC noted the continuing application of interstate and intrastate access charges in the context of landline communications, it omitted such language when referring to the CMRS communications. We will not ignore the clear distinction drawn by the agency.

We also agree with the CMRS providers that the RTCs' argument finds no support in paragraph 1043 of the First Report and Order. The sweep of this paragraph is limited to a narrow range of interstate interexchange traffic and is silent on the issue of reciprocal

23

compensation owed CMRS providers. As such, we find it neither persuasive nor controlling.

Having carefully reviewed the FCC's decision in TSR Wireless, LLC v. U.S. West Communications, Inc., we find nothing in that decision sounding as contrary to our holding. 15 F.C.C.R. 11,166 (2000), aff'd sum nom Qwest Corp. v. FCC, 252 F.3d 462 (D.C. Cir. 2001). TSR Wireless, LLC is factually dissimilar to the instant dispute. The relevant issue, the analysis and answer to which the RTCs cite, was whether "section 51.703(b)'s prohibition against charges for LEC-originated traffic prohibit[s] LECs from *charging* paging carriers for wide area calling services?" TSR Wireless, LLC, 15 F.C.C.R. at 11,183 (emphasis added). Section 51.703(b) prohibits LECs from charging other carriers for traffic originating on the LECs' networks. 47 C.F.R. § 51.703(b). In resolving this issue, the FCC reiterated that LECs may not charge CMRS providers for facilities used to deliver local traffic. TSR Wireless, LLC, 15 F.C.C.R. at 11,184. The Commission then noted that "[s]uch traffic falls under our reciprocal compensation rules if carried by the incumbent LEC, and under our access charge rules if carried by an [IXC]." Id. The FCC then stated that "[t]his may result in the same call being viewed as a local call by the carriers and a toll call by the end-user." Id. It is clear to us that the FCC made this seemingly incongruous comment in the context of discussing the effect on LEC customers. After making this comment, the Commission unequivocally stated that the LEC was required to deliver relevant calls free of charge to the CMRS provider, but

24

was not precluded from charging its own customers for toll calls.  Id.  This simply does not address the LEC's duty to compensate the CMRS provider for call termination.  Rather, it reflects the logical end result of the application of the FCC's regulations.  It certainly does not relieve the originating carrier of its obligation to compensate the terminating carrier under the reciprocal compensation regime.[12]

Finally, we find no merit in the RTCs' argument that the provisions in the instant agreements contravene the statutory scheme.  The RTCs' assertion that the FCC expected reciprocal compensation arrangements to be contained in agreements under section 251(c) is unsupported by the footnote to which they cite in TSR Wireless, LLC, 15 F.C.C.R. at 11,183 n.97, and undermined by language in the decision indicating that certain duties imposed under reciprocal compensation were operative regardless of the existence of an agreement.  Id. at 11,182-83.  The RTCs further argue that the indirect connection at issue in the instant agreements would render their rural exemption nugatory because carriers like the CMRS providers would not be required to request interconnection under 47

---

[12]We likewise find that the RTCs' reliance on Texcom, Inc., D/B/A Answer Indiana v. Bell Atlantic Corp, D/B/A Verizon Communications, 16 F.C.C.R. 21,493 (2001) ("Texcom"), is unwarranted.  Texcom involved "transiting traffic," i.e., traffic originating with a third party that "transits" the network of an LEC for delivery to a CMRS provider.  Id. at 21,495.  The FCC concluded that an LEC may charge the CMRS provider for the transport of such traffic.  Id.  This is, of course, in stark juxtaposition to an LEC's obligations where, as here, traffic originates with its own customers.  The FCC explained that in the reciprocal compensation setting, "the cost of delivering LEC-originated traffic is borne by the persons responsible for those calls, the LEC's customers."  Id. at 21,495.  The Commission refused to extend this burden in the "transit" setting where LEC customers did not generate the traffic at issue.  Id.

25

U.S.C. § 251(c). As we explained above, no such requirement applies to the CMRS providers, and the rural exemption remains available when the RTCs are confronted with requests for direct connection under § 251(c).

Accordingly, we hold that the OCC-approved agreements are not inconsistent with or in violation of the federal regulatory and statutory schemes.

V.     The "Western Wireless" Issue[13]

The final issue before us is unique to No. 04-6100. The RTCs assert that the Telecommunications Act requires competing carriers to establish a *physical connection* within an ILEC's network for the exchange of local traffic. While distinct from the assertion that traffic must be exchanged at a point of interconnection within the RTC's network, an analysis of this issue nonetheless touches on many aspects of our foregoing discussion.

The RTCs interpret 47 U.S.C. § 251(c) as imposing a requirement of direct connection on a competing carrier. We disagree. As detailed above, the affirmative duty established in § 251(c) runs solely to the ILEC, and is only triggered on request for direct connection. The physical interconnection contemplated by § 251(c) in no way undermines telecommunications carriers' obligation under § 251(a) to interconnect "directly or *indirectly*." In full accord with our previous analysis, we hold that the RTCs'

---

[13]The district court designated this issue "the Western Wireless issue." Atlas II, 309 F. Supp. 2d at 1313. We adopt this terminology for purposes of our discussion.

26

obligation to establish reciprocal compensation arrangements with the CMRS provider in the instant case is not impacted by the presence or absence of a direct connection.

For the foregoing reasons, we AFFIRM the orders of the district court.