# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1725

_____

WWC License, L.L.C.,                        *
                                            *
           Plaintiff - Appellee,            *
                                            *   Appeal from the United States
     v.                                     *   District Court for the District of
                                            *   Nebraska.
Anne C. Boyle, Chairman, in their           *
official capacities as Commissioners of     *
the Nebraska Public Service                 *
Commission; Frank E. Landis, Jr.,           *
Commissioner, in their official             *
capacities as Commissioners of the          *
Nebraska Public Service Commission;         *
Lowell C. Johnson, Commissioner, in         *
their official capacities as                *
Commissioners of the Nebraska Public        *
Service Commission; Rod Johnson, Jr.,       *
Commissioner, in their official             *
capacities as Commissioners of the          *
Nebraska Public Service Commission;         *
Gerald L. Vap, Commissioner, in their       *
official capacities as Commissioners of     *
the Nebraska Public Service                 *
Commission;                                 *
                                            *
           Defendants,                      *
                                            *
Great Plains Communications, Inc.,          *
                                            *
           Defendant - Appellant.           *

_____

No. 05-1726

_____

WWC License, L.L.C.,                        *
                                            *
        Plaintiff - Appellant,              *
                                            *  Appeal from the United States
    v.                                      *  District Court for the District of
                                            *  Nebraska.
Anne C. Boyle, Chairman, in their           *
official capacities as Commissioners of     *
the Nebraska Public Service                 *
Commission; Frank E. Landis, Jr.,           *
Commissioner, in their official             *
capacities as Commissioners of the          *
Nebraska Public Service Commission;         *
Lowell C. Johnson, Commissioner, in         *
their official capacities as                *
Commissioners of the Nebraska Public        *
Service Commission; Rod Johnson, Jr.,       *
Commissioner, in their official  *
capacities as Commissioners of the          *
Nebraska Public Service Commission;         *
Gerald L. Vap, Commissioner, in their       *
official capacities as Commissioners of     *
the Nebraska Public Service                 *
Commission;                                 *
                                            *
        Defendants - Appellees.             *

_____

Submitted:  December 12, 2005
Filed:  August 23, 2006

_____

Before MELLOY, COLLOTON and BENTON, Circuit Judges.

_____

MELLOY, Circuit Judge.

Both sides appeal a district court[1] judgment affirming in part and reversing in part two rulings from the Nebraska Public Service Commission ("Commission") under 47 U.S.C. § 252(e)(6), a section of the Telecommunications Act of 1996 ("Act"). In the first ruling, the Commission ordered amendments to an interconnection agreement between Great Plains Communications, Inc. ("Great Plains"), an incumbent local exchange carrier, and WWC License, L.L.C. ("Western Wireless" or "Western"), a competitive wireless carrier. In the second ruling, the Commission approved the amended agreement. The rulings dealt with various issues including: the duty to interconnect the two parties' telephone networks under 47 U.S.C. § 251(a); the scope of the incumbent's statutory duty to provide dialing parity under § 251(b)(3); the reciprocal compensation rate to be paid between the two parties under § 251(b)(5); and the payment of interim compensation under 47 C.F.R. § 51.715 for a period of time predating the effective date of the interconnection agreement. We affirm the judgment of the district court.

I.      General Background

Historically, incumbent local exchange carriers served as the exclusive providers of local telephone service and operated as state-sanctioned monopolies. With the Act, Congress moved to abolish the system of monopolies in favor of a competitive system with multiple potential carriers. Under the Act, competitive carriers—land-based or wireless—may compete with incumbent carriers for the provision of local service. To facilitate the market entry of competitors and ensure the

_____

[1]The Honorable Lyle E. Strom, United States District Judge for the District of Nebraska.

-3-

integration of competitors' networks with incumbents' networks, the Act imposes certain specific duties and costs upon incumbent carriers. See 47 U.S.C. § 251(c)(1)-(6) (enumerating incumbent-specific duties). The Act imposes other duties on incumbent and competitive carriers alike, such as the duty to interconnect directly or indirectly and to provide number portability, dialing parity, access to rights-of-way, and reciprocal compensation for the transport and termination of telecommunications. 47 U.S.C. § 251(a) and (b).[2]

The specific statutory duties in dispute in this case are subsection (a) and (b) duties. One of these duties is the duty of both carriers to directly or indirectly interconnect their networks under § 251(a)(1). As the labels suggest, direct connections between carriers involve actual physical points of interconnection between networks; indirect connections involve connections via third parties' networks.

Another duty at issue is the duty of carriers to provide local dialing parity. Local dialing parity includes the recognition of local numbers for competitors' customers and the treatment of certain calls between carriers' customers as local calls, with seven-digit dialing. The obligation to provide dialing parity is found in § 251(b)(3) and 47 C.F.R. § 51.207. This obligation reflects a congressional determination that local dialing is important to provide a level playing field, promote competition, and eliminate artificial barriers that might prevent customers from switching carriers. See Implementation of the Local Competition Provisions of the

_____

[2]The Act provides exemptions for certain incumbent rural carriers who may avoid or limit their obligations under § 251(b) or (c) if the obligations would be "unduly economically burdensome" or not "technically feasible." 47 U.S.C. § 251(f)(1) and (2). Regarding exemptions from subsection (b) duties, the incumbent must petition its state commission for suspension or modification of the duties. Id. at § 251(f)(2). Great Plains does not argue that it petitioned for relief from its subsection (b) duties under the exemption provisions of § 251(f)(2). Rather Great Plains presents arguments directed towards the interpretation of § 251(b) itself.

<u>Telecommunications Act of 1996</u>, 11 F.C.C.R. 19392, 19398-400 at ¶¶ 1, 3-4, 1996 WL 819798 (August 8, 1998) ("Second Report and Order") (discussing the Act and its history, including S. Conf. Rep. No. 104-230).

The final duty at issue is the duty of the parties to pay one another reciprocal compensation. Reciprocal compensation is payment from the carrier who originates a call to the carrier who terminates or receives a call. Reciprocal compensation is intended to permit the carrier for the customer who receives a call to recoup from the caller's carrier those expenses incurred for terminating the call or sending it to its final destination. See <u>Ace Tel. Ass'n v. Koppendrayer</u>, 432 F.3d 876, 878 (8th Cir. 2005); 47 U.S.C. § 252(d)(2)(A)(i) (stating that reciprocal compensation must "provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier"). The parties dispute the per-minute rate to be used for reciprocal compensation as well as the obligation to pay one another for telecommunications traffic that predated the Nebraska Commission's approval of the interconnection agreement.

II.    Factual Background

Great Plains, the incumbent local exchange carrier, operates in specific areas of Nebraska known as local exchange service areas. Western Wireless, the competitive wireless carrier, operates under the trade name CellularOne throughout a substantial part of Nebraska known as a major trading area. The Western Wireless major trading area is larger than and overlaps or encompasses multiple Great Plains local exchange service areas.[3]

---

[3]See <u>Iowa Network Servs., Inc. v. Qwest Corp.</u>, 363 F.3d 683, 687 (8th Cir. 2004) ("Traditional notions of 'local exchange areas' do not fit neatly into this new world of wireless communications. For wireless communications, the country is divided into Major Trading Areas (MTAs) rather than local exchange areas. Thus, the

Great Plains, as an incumbent local exchange carrier, has substantial network infrastructure in each of its local exchange areas. This infrastructure includes wire loops that connect land-line phones as well as switching equipment for the physical routing of calls. The switches Great Plains currently uses are called end office switches. From these end office switches, Great Plains delivers and receives calls to and from locations outside its own networks over trunk lines. The trunk lines are connected to different switches called tandem switches. The tandem switches are owned by larger, interexchange carriers such as Qwest (formerly U.S. West Communications) and Alltel. Often, the tandem switches owned by the larger carriers are located at points that are physically outside the Great Plains local exchange networks.

Historically, when Great Plains routed calls outside its local exchange networks and passed the calls off to the interexchange carriers at the tandem switches, Great Plains treated the calls as toll calls for dialing and billing purposes, with the Great Plains customers using ten-digit dialing to place the calls. Great Plains treated calls within its individual local exchange networks, between numbers assigned to the same rate center, as local calls with seven-digit dialing.

Western Wireless began sending calls from its wireless customers to the land-line customers of Great Plains via interexchange carriers prior to March 1998. This practice was possible because Western Wireless entered into contracts with interexchange carriers and established physical points of interconnection with the interexchange carriers. Through these contracts and physical points of interconnection, Western Wireless was indirectly connected to the Great Plains networks.

local calling area for a cell phone user is determined by the cell phone user's MTA.").

The amount of traffic between Western Wireless and Great Plains increased quickly and substantially, and the two companies began informal negotiations on their own interconnection agreement in July 2001. Informal negotiations continued through August 26, 2002, when Western Wireless submitted a formal, bona fide request for the commencement of negotiations under Section 252 of the Act. See 47 U.S.C. § 251(c)(1) (imposing on requesting competitive carriers and incumbent carriers alike the duty to negotiate in good faith to establish terms and conditions for interconnection agreements); Id. at § 252 (setting forth the procedure for the negotiation, arbitration, and approval of interconnection agreements). Formal negotiations resulted in partial resolution, but the companies deadlocked on eight separate issues. The Nebraska Commission, which is required to approve interconnection agreements, referred the disputed issues to a neutral arbitrator for resolution. See 47 U.S.C. § 252(e)(1) (assigning the duty to approve interconnection agreements to state commissions).

Both parties submitted proposed contract language, testimony, and evidence in hearings before the arbitrator. On July 1, 2003, the arbitrator issued an opinion resolving most of the outstanding issues in Western's favor. Subsequently, on September 23, 2003, the Nebraska Commission reversed or modified the arbitrator's decision as to every issue presently on appeal. Western appealed the decision to the district court under 47 U.S.C. § 252(e)(6). On January 20, 2005, the district court reversed in part and affirmed in part.

III. Discussion

We do not discuss every issue decided by the arbitrator, Nebraska Commission, and district court because not all issues are presented for appeal. We discuss only those issues that remain in dispute and such other issues necessary to paint a complete picture of the case. The issues that remain are identified by the parties as: (A) tandem

routing and local dialing parity; (B) reciprocal compensation rate; and (C) retroactive compensation.

### A. Tandem Routing and Local Dialing Parity

The issue of tandem routing[4] and local dialing parity concerns the effects of Western Wireless's election not to connect directly with the Great Plains networks in each of the Great Plains local exchange areas. As noted above, Western Wireless elected to indirectly connect with Great Plains through third parties' tandem switches rather than placing actual points of interconnection in the Great Plains local exchanges. Because Great Plains historically treated calls from its own local exchange networks that had to be sent to interexchange carriers' tandem switches as long distance or toll calls, Great Plains's hardware and software is not currently configured to send local calls to the tandem switches. As a result, Great Plains argues that if calls from its customers to Western's customers have to pass outside the originating local exchange network and pass through a tandem switch for delivery (i.e., if the calls have to be tandem routed), they need to be treated as toll calls. Great Plains advocates this position regardless of the fact that the Western customers receiving the calls might live next door to the Great Plains customers placing the calls and regardless of the fact that customers' numbers might be assigned to the same rate center.

---

[4]The parties use the term "tandem routing" to refer to the routing of calls through interexchange carriers' tandem switches rather than through direct points of connection inside the Great Plains networks. Since Western Wireless's customers might live within an area inside the geographic boundaries of Great Plains network, the customers could have numbers that are rated to that location. With tandem routing, however, a call from the Great Plains network to the Western customer would have to travel to a routing point at the interexchange carrier's tandem switch, a location potentially far away from the edge of the Great Plains network and the rating location. The parties refer to this divergence as the issue of separate rating and routing points for numbers or separately rated and routed calls.

Great Plains's argument, in essence, is that the duty to provide local dialing parity under 47 U.S.C. § 251(b)(3) is dependent on the existence of a direct point of interconnection such that the duty to provide local dialing parity stops at the physical edges of the local exchange networks. As a practical matter, Great Plains argues this position because providing local dialing parity through tandem routing would impose various costs on Great Plains including transport costs and costs related to equipment and/or software changes. To buttress its argument, Great Plains asserts that local dialing parity with tandem routing is incompatible with (1) the telecommunications networks in Nebraska, (2) Great Plains's current switches (hardware), (3) Great Plains's current routing and billing software, and (4) Great Plains's equal access and toll dialing parity obligations under federal and Nebraska law.[5]

The contract language proposed by Great Plains and adopted by the Nebraska Commission regarding this issue was as follows:

> In those Great Plains exchanges where Western Wireless has not requested a direct connection to Great Plains . . . , Great Plains shall continue to *route calls originating from its exchanges to Interexchange Carriers in compliance with its equal access and toll dialing parity requirements.*

(Emphasis added).

Western Wireless counters that, consistent with the Act, Great Plains has a duty to provide local dialing parity for all calls placed by Great Plains customers to Western customers if the Western customers' numbers are from the same rate center as the Great Plains customers' numbers. Western demands local dialing parity even

---

[5]Equal access and toll dialing parity are terms related to the duty of local carriers to permit customers to select their own choice between long distance carriers and the duty of local carriers to treat the selected long distance carriers in a nondiscriminatory fashion.

though, in most cases, Great Plains would have to incur transport costs or make new technical arrangements to physically route the locally dialed call outside the Great Plains network to an interexchange carrier's tandem switch before it could be passed to Western's network for delivery to the Western customer.

Western argues that such parity is necessary to truly enable competition because if Great Plains customers are not able to call Western customers on a local, seven-digit basis, the inconvenience could deter customers from switching to Western. Western characterizes the Great Plains position as an attempt to create a barrier to competition inconsistent with the goals of the Act. Western argues that the obligation to provide local dialing parity is a general duty that is not conditioned on the existence of a direct connection. Western argues further that the duty to provide local dialing parity is compatible with tandem routing and cannot be excused based on technical difficulties or expense to the incumbent.

The contract language proposed by Western regarding this issue was as follows:

> If Western Wireless obtains numbers, and [rates] those numbers to a Great Plains rate center where Western Wireless is licensed to provide service, calls from that rate center to the Western Wireless number block *must be dialed as local calls and delivered to Western Wireless* at a point of direct interconnection (if applicable) *or at the third-party tandem.*

(Emphasis added).

The arbitrator ruled in favor of Western and adopted Western's contract language, finding that Great Plains had to provide the tandem routing and local dialing parity demanded by Western. In so finding, the arbitrator relied on cases from other circuits that had held indirect connections sufficient to trigger reciprocal compensation duties and that held incumbent carriers could not charge competitors fees for the cost of delivering local traffic to distant points of indirect interconnection. See Atlas Tel.

-10-

Co. v. Okla. Corp. Comm'n, 400 F.3d 1256, 1262-68 (10th Cir. 2005) (holding that all calls between wireless and wireline carriers that originate and terminate within the same major trading area are subject to reciprocal compensation even if the wireline carrier is required to deliver calls to a distant point of interconnection); MCIMetro Access Transmission Servs., Inc. v. Bellsouth Telecom., Inc., 352 F.3d 872, 881 (4th Cir. 2003) (holding that a wireline carrier could not charge transport fees for delivering a wireless carrier's intra-major-trading-area calls to a point of interconnection outside the originating local exchange network). The arbitrator also relied on the fact that the FCC had designated major trading areas as the local areas for wireless providers for the separate and distinct purpose of defining the class of calls subject to reciprocal compensation under 47 U.S.C. § 251(b)(5). See Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 F.C.C.R. 15,499, at ¶ 1036, 1996 WL 452885 (August 8, 1996) ("First Report and Order") ("Accordingly, traffic to or from a [wireless provider's] network that originates and terminates within the same MTA is subject to transport and termination rates under section 251(b)(5), rather than interstate and intrastate access charges.")[6] The arbitrator found that when the FCC characterized the major trading area as the local area, the FCC "meant for [wireless providers] to enjoy all the benefits of that designation of a [major trading area], including local dialing parity."

---

[6]Earlier in his ruling, the arbitrator found that the local area for the purpose of reciprocal compensation under 47 U.S.C. § 252(b)(5) should be the entire Western Wireless major trading area. In so ruling, the arbitrator relied on the First Report and Order. The Nebraska Commission subsequently rejected the arbitrator's ruling on this separate issue. The district court, in turn, agreed with the arbitrator and reversed the Nebraska Commission. Neither party appeals the district court's ruling on this issue. Accordingly, it is now undisputed that the local area for purposes of reciprocal compensation under § 252(b)(5) for calls *in both directions* between Great Plains and Western is the entire Western Wireless major trading area. For a detailed analysis of the issue of local calling areas for the purpose of reciprocal compensation, see Atlas, 400 F.3d at 1262-68. The remaining dispute, as described above deals with the provision of local dialing parity under § 251(b)(3), not reciprocal compensation.

The arbitrator did not find potentially costly technical impediments for Great Plains to be material in identifying the scope of Great Plains's statutory duty to provide local dialing parity. Further, the arbitrator expressly rejected the claim by Great Plains that the provision of local dialing parity through tandem routing was not technically feasible. In doing so, the arbitrator noted that one of Great Plains's witnesses testified that the current Great Plains switches could be programmed to insert digits into dialed numbers so that a number dialed with only seven digits would look like a "1+" or ten-digit number when leaving the Great Plains end office switch. Further, the arbitrator was swayed by the fact that Western had asked, in an interrogatory to Great Plains, whether there existed any technical impediments to the provision of tandem routed local traffic. Great Plains responded to the interrogatory by objecting and characterizing the question as a legal or policy issue rather than a technical issue.[7] Accordingly, the arbitrator found Great Plains' assertion of purported technical impediments to be disingenuous.

The Commission rejected the arbitrator's conclusion as to the issue of local dialing parity and tandem routing, adopted Great Plains's argument, and held that Western Wireless had to directly connect with each Great Plains network where it wanted to receive the benefits of local dialing parity. In doing so, it cited technical

---

[7]Western's Interrogatory No. 11 stated:

Western has proposed obtaining numbers with a routing point at a Qwest or Alltel tandem but a rating point at a Great Plains end office served by that tandem. Identify any technical reason why Great Plains could not deliver traffic to Western Wireless on a local basis pursuant to Western Wireless'[s] proposal.

Great Plains, in its response, stated:

Great Plains objects to this Interrogatory on the grounds that it inherently involves legal and public policy issues that are not proper matters for discovery and is not a "technical" matter.

features of the trunk line system in Nebraska and the end office switches used by Great Plains. It stated the current configuration of switches and software used by Great Plains and the nature of the trunk system in Nebraska would not permit Great Plains to distinguish between toll calls and local calls sent to the interexchange carriers' tandem switches. The Commission further stated that Great Plains would have to violate its toll dialing parity obligations in order to provide local dialing parity through tandem routing outside the local exchange network. It did not address the testimony from the Great Plains witness regarding technical feasibility nor did the Commission address the failure by Great Plains to respond to the interrogatory that asked Great Plains to identify any technical impediments.

The district court reversed, found the arbitrator's ruling to be consistent with the Act and held, essentially, that the Commission had created an exception to the incumbent's duty to provide local dialing parity where no such exception exists in the Act.

Great Plains appeals the district court's ruling on the issues of tandem routing and local dialing parity.

We understand the issue of local dialing parity and tandem routing to be an issue of cost apportionment. If Western Wireless is required to establish and maintain points of direct interconnection within each individual Great Plains local exchange area, Western Wireless will face a substantial price for market entry. On the other hand, if Great Plains is required to extend local dialing parity to those Western Wireless customers who possess locally rated numbers, Great Plains will be required to bear the expense of transporting calls outside its local exchange networks. This will force Great Plains to change its software and/or switches to enable it to send seven-digit local calls to the interexchange carriers (or make some other arrangements for the delivery of local calls to a tandem switch for termination on Western's network).

Our analysis of this issue turns largely on the applicable standard of review. We apply the same standard of review to the Commission's decision as did the district court. We review the Commission's factual determinations and mixed questions of law and fact under a deferential standard, affirming unless the Commission's decision is arbitrary and capricious. Qwest Corp. v. Koppendrayer, 436 F.3d 859, 863 (8th Cir. 2006). We owe no deference to the Commission's interpretations of federal law, however, and our review of the agreement for compliance with the Act is de novo. Id.; see also Atlas, 400 F.3d at 1262 (applying de novo review to a state commission's interpretation of the Act); MCIMetro, 352 F.3d at 876 (same); Mich. Bell Tel. Co. v. MFS Intelenet of Mich., Inc., 339 F.3d 428, 433 (6th Cir. 2003) (setting forth a dual standard of review: review of interconnection agreements for compliance with the Act is de novo while review of further issues regarding state commission analysis of interconnection agreements is under a deferential standard). Finally, in our interpretation of the Act, we owe deference to the Federal Communications Commission ("FCC") based on the fact that Congress expressly charged the FCC with the duty to promulgate regulations to interpret and carry out the Act. See AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 378 (1999) (holding that Congress expressly authorized the FCC to promulgate regulations under the Act, even regarding issues that had traditionally been under the exclusive jurisdiction of state utility commissions).

In each section below, we discuss the applicable standard of review that applies to each separate issue. We find that the applicable standards for our review of the Commission's determinations are de novo as to the tandem routing/local dialing parity issue and arbitrary and capricious as to the rate-related issues.

Great Plains characterizes the issue of tandem routing and local dialing parity as a mixed issue of law and fact such that resolution of this issue turns on factual distinctions novel to the networks and equipment in play in this case. As a result, Great Plains argues that we must reverse the district court and affirm the Nebraska

Commission unless the Commission's ruling is arbitrary and capricious. Western argues that this issue presents a pure question of federal law because it only requires us to interpret 47 U.S.C. § 251(a) (regarding the duty to interconnect directly or indirectly) and § 251(b)(3) (regarding the duty to provide local dialing parity).

We agree with Western Wireless. The technical impediments and factual issues specific to Nebraska in general or Great Plains in particular could only be material if, as a matter of law, expense, inconvenience, or technical difficulty are recognized exceptions to the duties under 47 U.S.C. § 251(a) and (b). As already noted, the exemption provision of §251(f) is not at issue in this case, and Great Plains seeks interpretation of § 251(a) and (b) rather than a determination regarding the applicability of any exemption provisions in the Act. Because resolution of the tandem routing/local dialing parity issue requires only interpretation of the Act, and because nothing in the Act makes the Commission's findings concerning the nature of the Great Plains network material to our analysis, our review is de novo.[8]

Turning to the merits, Great Plains emphasizes that § 251(b)(3) and the relevant regulation, 47 C.F.R. § 51.207, do not expressly state that a local exchange carrier must deliver locally dialed calls to a point outside the local exchange carrier's network. Great Plains infers from this silence that the duty to provide local dialing parity does not extend beyond the physical bounds of the local exchange network and is therefore dependent upon the existence of a competitor's direct point of interconnection within the local exchange. We believe that this inference is unwarranted. The relevant statutory and regulatory sections are not written in such narrow terms. Rather, the Act and the regulation state a broad duty without listing

---

[8]We note also that Great Plains has switched positions in the course of these proceedings, first refusing to respond to discovery by calling the compatibility of local dialing parity and tandem routing a legal or policy issue and now demanding that we treat the issue as one that rests entirely on factual issues concerning Great Plains' equipment and networks in Nebraska.

-15-

exceptions and without expressly defining a geographic limitation. The statute provides:

> Each local exchange carrier has the following duties:
> . . .
> (3) Dialing Parity
> The duty to provide dialing parity to competing providers of telephone exchange service and telephone toll service, and the duty to permit all such providers to have nondiscriminatory access to telephone numbers, operator services, directory assistance, and directory listing, with no unreasonable dialing delays.

47 U.S.C. § 251(b). The regulation states:

> A LEC shall permit telephone exchange service customers within a local calling area to dial the same number of digits to make a local telephone call notwithstanding the identity of the customer's or the called party's telecommunications service provider.

47 C.F.R. § 51.207. While the regulation speaks in terms of "customers within a local calling area" it does not specifically deal with issues of routing or interconnection, it does not define the term local calling area, and it does not suggest on its face that the phrase "local telephone call" has a meaning in this context different from the meaning assigned in other contexts. Accordingly, we do not find it appropriate to adopt the inference urged by Great Plains.

We do, however, find several factors that aid in our interpretation of the local dialing parity provisions. First, all else being equal, if a provision of the Act is vague we are inclined to interpret the provision in a manner that promotes competition. It is undisputed that Congress passed the Act with the intention of eliminating monopolies and fostering competition. We do not suggest that this general intent should be used to impose duties on incumbents beyond those created by Congress.

We do, however, believe that this general intent should guide our consideration of competing interpretations of the Act. Such guidance suggests that we should be wary of interpretations that simultaneously expand costs for competitors (such as a requirement for direct connections) and limit burdens on incumbents (such as a limitation of dialing parity to local exchange boundaries). If a cost is imposed on a competitor, it becomes a barrier to entry and rewards the company who previously benefitted from monopoly protection. Because Congress passed the Act with a clear intent to foster competition, we are more inclined to interpret a vague provision in a manner that reduces barriers to entry.

Second, the FCC has spoken unequivocally and stated that a wireless provider's major trading area is the local area for the purpose of reciprocal compensation. Great Plains does not dispute this issue on appeal, and numerous other circuits have held that an incumbent carrier is required to respect a competitor's election to establish a point of interconnection at a location distant from the local exchange network. See Atlas, 400 F.3d at 1268; Mountain Comm'ns, Inc. v. FCC, 355 F.3d 644, 649 (D.C. Cir. 2004); MCIMetro, 352 F.3d at 881. In each of these cases, the duty of reciprocal compensation rather than local dialing parity was at issue. This does not mean, however, that the holdings are immaterial to our analysis. Reciprocal compensation, like local dialing parity, is a § 251(b) duty, and Great Plains offers no authority to support the position that we must apply a different meaning in the context of local dialing parity.

That having been said, neither Congress nor the FCC has expressly defined the relevant area for a local exchange carrier's provision of local dialing parity to a wireless competitor. Further, the FCC and the industry are well aware of this outstanding question, as demonstrated by the subject matter of a pending petition for declaratory ruling before the FCC. See Sprint Corp. Petition for Declaratory Ruling Regarding the Routing and Rating of Traffic by ILECs, CC Docket No. 01-92 (May 9, 2002) ("Sprint Petition") (asking the FCC to define the scope of the duty to provide

local dialing parity when there exists no direct point of interconnection within the local exchange network); Comments Sought on Sprint Petition for Declaratory Ruling Regarding the Routing and Rating of Traffic by ILECs, 17 F.C.C.R. 13859, 2002 WL 1586410 (July 18, 2002) (establishing the pleading cycle and soliciting public comment on the Sprint Petition). In fact, on March 3, 2005, the FCC solicited further comments on the Sprint Petition, but the FCC has not yet issued a ruling. See Developing a Unified Intercarrier Compensation Regime, CC Docket No. 01-92, Further Notice of Proposed Rulemaking, FCC-05-33 (2005) (recognizing the continuing pendency of the Sprint Petition and calling for further comments).

Great Plains suggests the FCC necessarily will limit local exchange carriers' dialing parity obligations and not carry over the local area definition applicable to reciprocal compensation. Great Plains infers that, if the FCC intended to interpret the local dialing parity duty as extending beyond local exchange network boundaries, it would have done so immediately rather than delaying and soliciting further comments. Great Plains suggests that we act in reliance on this prediction of the outcome in the pending Sprint Petition.[9] While it is possible that the FCC might rule in a manner consistent with Great Plains's current position, and while it is true that we would owe deference to the FCC if it were to issue a ruling or regulation interpreting the Act in this regard, we owe no deference to the FCC's silence. If and when the FCC rules, we may be required to revisit this issue. At such time, we would be armed with better arguments and a better understanding of the issue based on the FCC's expertise. Until then, however, we must interpret the Act without the benefit of agency guidance on this specific point. Without textual support, agency guidance, or other authority to

_____

[9]More precisely, because Great Plains argues that we should apply the arbitrary and capricious standard to analyze the issue of tandem routing and local dialing parity, Great Plains argues that if the FCC considers this issue debatable, the Commission's position cannot be considered arbitrary and capricious. Because we apply de novo review, this argument carries no weight.

treat reciprocal compensation differently than dialing parity, we will not impose on Western the duty to connect directly.

Third, the statutory provision that imposes the duty to interconnect networks expressly permits direct or indirect connections. 47 U.S.C. § 251(a)(1). Nothing in the Act suggests that Congress intended a carrier's duties to be altered based on the carrier's election to connect indirectly rather than directly. We believe that if Congress intended there to be consequences attendant to choosing an indirect rather than a direct connection, Congress could have made that fact clear. Accordingly, any distinction we might draw based on the existence of a direct connection would be textually unsupported.

We note also that the structure of the Act suggests that we should reject a direct connection requirement as a condition on local dialing parity. In Atlas, 400 F.3d at 1265-66, incumbents who wanted to force direct connections argued that the general duty to interconnect directly or indirectly was superceded by a specific provision, § 251(c)(2)(B), that imposes upon an incumbent carrier a duty to permit a requesting carrier to interconnect directly with the incumbent's local exchange network "at any technically feasible point within the carrier's network." 47 U.S.C. §251(c)(2)(B). The Tenth Circuit examined the structure of the Act to reject this argument. It noted that the subsection (c) duty applied only to incumbent carriers and only if a competitor requested a direct connection. Id. Since the section (c) duty did not apply to competitors, the Tenth Circuit was unwilling to impose on competitors a duty to connect directly rather than indirectly. Further, that court noted that Congress created specific exceptions for the subsection (c) duties as set forth in 47 U.S.C. § 251(f), such that it would be "inconceivable" that the drafters would have imposed a direct connection requirement on competitors while at the same providing an exemption to the accommodation duty of the incumbents because such a duty would function "as a significant barrier to the advent of competition." Atlas, 400 F.3d at 1266.

Finally, to the extent that Great Plains argues that technical issues control in this case, we reject that argument. The statutory duties under examination are not limited with reference to technical feasibility or expense. Further, Great Plains did not invoke the protections of subsection (f) when dealing with the Commission. Finally, even if technical matters carried weight in our analysis, Great Plains's own expert and Great Plains's responses to discovery demonstrate that technical infeasibility should not excuse performance in this case.

Because we do not believe the Act permits the Commission to impose a direct connection requirement as a condition on the receipt of local dialing parity, we affirm the district court and reverse the Commission as to the issue of tandem routing and local dialing parity.

B.      Reciprocal Compensation Rate

The district court determined that all calls between Western Wireless and Great Plains that originate and terminate in the Western Wireless major trading area are subject to reciprocal compensation. Neither party appeals the district court's finding in this regard. See supra note 6. What the parties dispute is the actual reciprocal compensation rate.

The parties agree that the rate must be based on a forward-looking, long-term network model that attempts to determine the incremental cost per minute of use on a modern network. This model includes costs calculated using the Total Element Long Run Incremental Costs ("TELRIC") method. The FCC defines TELRIC as:

> The total element long-run incremental cost of an element is the forward-looking cost over the long run of the total quantity of the facilities and functions that are directly attributable to, or reasonably identifiable as incremental to, such element, calculated taking as a given the incumbent LEC's provision of other elements.

47 C.F.R. § 51.505(b). In addition, the rate may include "[a] reasonable allocation of forward-looking common costs." Id. at § 51.505(a)(2). The parties disagree as to whether the evidence in the current record is adequate to support certain of the cost elements claimed by Great Plains. In addition to this evidentiary skirmish, there are outstanding disputes regarding the propriety of including certain specific switching and transport costs. Because of the fact intensive nature of this inquiry into pricing, we owe deference to the Nebraska Commission's rate determination and must affirm unless it acted arbitrarily and capriciously when it set the rate. See Qwest Corp. v. Koppendrayer, 436 F.3d 859, 863 (8th Cir. 2006) (applying the arbitrary and capricious standard of review to determinations by a state commission concerning rate-setting issues).

In front of the arbitrator, Great Plains submitted the results of a cost study based on a forward-looking model. Western elected not to conduct its own study, but rather, offered a critique of the Great Plains study. Both parties had submitted initial rate proposals, and both parties compromised to a limited extent before submitting final offers to the arbitrator. The arbitration was issue-by-issue arbitration as mandated by the Nebraska Commission, and the arbitrator was forced to choose one of the two parties' proposed rates without amendment. Great Plains had proposed a final rate of $0.0232 per minute of use. Western had proposed a final rate of $0.00609 per minute of use. The arbitrator determined that the most appropriate rate would be in the range of $0.01-0.014 per minute of use and, reluctantly, selected the Western rate.

Unlike the arbitrator, the Commission was not bound to accept one party's proposal without amendment. It considered both parties' final proposals as well as the arbitrator's analysis. It then took the arbitrator's mid-range number as a starting point and adjusted upward to a final rate of $0.0208 per minute of use, resolving several individual points of dispute to reach the final rate. The district court affirmed the Nebraska Commission's rate determination.

We need not address each individual cost element that contributed to the Nebraska Commission's overall, composite figure of $0.0208 per minute of use. Rather, we focus only on those elements that remain in dispute. The rate is comprised of two categories of cost elements. $0.0079 per minute of use is allocated to termination or switching costs, and $0.0129 per minute of use is allocated to transport costs. The parties dispute both of these cost element categories.

(1)     Switching/Termination Rate

Regarding switching costs, Western argues that $0.0060 per-minute-of-use out of the $0.0079 total fails to meet the pricing standards set forth in 47 U.S.C. § 252(d)(2). Section 252(d)(2) requires that costs be determined on the "basis of a reasonable approximation of the additional costs of terminating such calls." Western argues that the disputed $0.0060 per minute of use is based on the cost of certain switches that Great Plains included in its cost study. Western argues that these switches are necessary for Great Plains to have a network capable of servicing its own local exchange customers even without consideration of traffic with Western. Western therefore argues that the cost of these switches should be considered part of the necessary equipment for a local network (like wire loops), should be charged on a flat-rate, per-line basis to Great Plains's network customers, and should not be included in the reciprocal compensation rate. Western also argues that the current and reasonably anticipated volume of traffic on the networks is so small, and that the smallest available switches are so powerful, that it is not appropriate to characterize the switches as having any cost that varies with use or that contributes additional cost to the termination of calls. Thus, Western argues the entire cost should be allocated to Great Plains's customers on a flat rate basis. In making this argument, Western relies on the FCC's First Report and Order, cited above, which sets forth a principle of "cost causation" as follows:

> Only those costs that are incurred in the provision of the network elements in the long run shall be directly attributable to those elements. Costs must be attributed on a cost-causative basis. Costs are causally-related to the network element being provided if the costs are incurred as a direct result of providing the network elements, or can be avoided, in the long run, when the company ceases to provide them.

First Report and Order at ¶ 691.

Although Western's argument has some appeal, it fails to recognize that the FCC has interpreted the Act to permit state commissions to assign some common costs, like switching costs, not only on a flat-rate, per-line basis, but also on a per-minute-of-use basis, or on some combination of the two methods. See 47 C.F.R. § 51.505(a)(2) (stating that forward looking costs are a combination of TELRIC and a "reasonable allocation of forward-looking common costs"); 47 C.F.R. § 51.509(b) ("Local switching costs shall be recovered through a combination of a flat-rated charge for line ports and one or more flat-rated or per-minute usage charges for the switching matrix and for trunk ports."). This is in contrast to costs such as local loop and subloop costs that must be recouped on a flat-rate basis. See id. at § 51.509(a) ("Loop and subloop costs shall be recovered through flat-rated charges."). Because the Commission permissibly used a combination of the two methods prescribed by Rule 51.509(b), we cannot say that it acted arbitrarily or capriciously when it found that it was reasonable to apportion some of the cost of the switches to the termination of calls on a per-minute basis rather than charging all switch costs on a flat, per-line basis.

To reach the $0.006 per-minute-of-use switching figure for inclusion in the overall rate, the Commission specifically found that the disputed switching costs were attributable 70% to usage and 30% to flat-rate loop costs. It is a much closer question whether the Commission acted arbitrarily or capriciously when it found that it was reasonable to attribute, specifically, 70% of the cost of the switches on a per-minute,

usage basis. We note that state commissions enjoy wide latitude on this issue because not only is our review deferential, but also because the substantive standard applied by state commissions is only one of reasonableness. Still, the only reference we find in the present record to the 70%/30% figure is a conclusory statement by Great Plains's cost model expert that "30 percent of the switching costs were excluded as nontraffic sensitive to account for line equipment of the switch."

This conclusory statement from an expert likely would not be sufficient for us to rely upon under a de novo standard of review. However, our deferential review is due in part to the superior technical expertise of state commissions. As such we should not lightly reverse a state commission's assessment of reasonableness. Further, Western has not attacked the particular election of the 70%/30% split as unreasonable; rather, Western attacks the inclusion of switching costs in general as impermissible. As a result, we do not fault the Commission for the absence of an extensive record setting forth the complete foundation for the precise apportionment. Further, we note that the Great Plains expert testified and was subject to cross-examination in arbitration and there is no allegation that the arbitration was tainted by procedural irregularities. Although this issue is close, given our conclusion that it is permissible to include some switching costs, we are not prepared to declare the Nebraska Commission's reasonableness determination arbitrary and capricious merely because that body was willing to rely on the expert's conclusion.

(2)    Transportation Rate

Regarding the transportation rate, there are two points of dispute, one evidentiary and one substantive. The evidentiary dispute arises because, after evidence was submitted, Great Plains included a table of figures in its briefing that the Commission relied upon to set the transportation rate. Western argues that many of the figures in the table enjoy no support in the record, and therefore, should not be treated as evidence. Having carefully reviewed the testimony of Great Plains's pricing

expert, it is clear that the figures in the table do, in fact, enjoy support in the record. As explained more fully below, the specific figures at issue concern the allocation of certain costs between functions to be included or excluded from the transportation rate. In his testimony, the Great Plains expert identified the appropriate percentage allocation for inclusion in the transportation rate as 70-75%. The disputed table includes figures not found in the record, but generated from data found in the record modified to take into account the expert's range, using an assumption of 72%. There is no error in relying on specific data points not in the record if those data points are derived from evidence that is in the record.

Regarding the substantive dispute, we again affirm the Nebraska Commission's rate determination. The $0.0129 per-minute-of-use transportation rate is a final number that Great Plains arrived at by calculating a larger, gross transportation rate and subtracting a percentage from that gross rate based on the fact that some transportation services provided by Great Plains are related to services not charged on a per-minute-of-use basis. Western does not currently challenge the determination of the larger, gross transportation cost figure, and the parties agree that it is necessary to subtract at least a portion of the gross transportation figure. Rather Western challenges the particular apportionment of 72% of the transportation costs to functions that can be included in the net transportation rate of $0.0129 per-minute-of-use.

Specifically, the forward-looking network proposed by Great Plains for the purpose of rate calculations is a network that provides functions over different kinds of circuits, including functions above and beyond those necessary to carry traditional usage-based switched services. The parties refer to these other functions as special access services and state that such functions include elements such as high capacity transport circuits dedicated to single users who pay flat monthly charges rather than charges based on per-minute rates. An example of a special access service provided by Great Plains is dedicated video service to schools.

In determining the proper method to reduce the gross transport figure to isolate proper, cost-causative transport functions from costs that are unrelated to the provision of per-minute, usage-based services, it is necessary to choose a method of calculation. The Act and the regulations do not mandate the use of a particular method. Of three possible methods cited and discussed by the parties, Western attacks one method as impermissible. This one method is the method employed by Great Plains.

The three possible methods for determining a proper allocation are identified as (1) the circuit count method, (2) the rate equivalency method, and (3) the bandwidth method. It suffices to note that Great Plains and Western agree that there is no legal impediment to the use of the circuit count or bandwidth methods. Roughly speaking, these two methods apportion costs between usage-based and special access services, respectively, based on the number of circuits dedicated to each function or based on the percentage of total bandwidth dedicated to each function. Using the circuit count method, the Great Plains cost expert initially recommended the allocation of 89% of the gross transportation rate to usage-based services. Western advocated use of the bandwidth method, and, before the arbitrator, concluded that 14-25% of the gross transport costs should be allocated to usage-based services.

Using the challenged rate equivalency method, the Great Plains expert testified that an allocation of 70-75% would be appropriate, and Great Plains provided calculations that the Commission relied upon using an allocation of 72%. This rate is within the broad range (14% - 89%) defined using the two unchallenged methods. As such, we should not reject the Commission's final transportation rate determination as arbitrary and capricious even if the precise method used appears problematic.

That having been said, even if the resulting percentage were not within the permissible range, it is not clear that use of the rate equivalency method in this context would rise to the level of reversible error. Under the rate equivalency method, Great Plains looked at its retail rates for both types of services (per-minute usage services

and special access services) as those retail rates then existed under state tariffs. Great Plains then used the percentage break-down in rates to infer a percentage break-down for the allocation of transportation costs. In general, the use of retail costs and historical, embedded costs as reflected in existing tariffs rather than costs based on forward-looking networks is prohibited. See 47 C.F.R. § 51.505(d)(2) (stating that retail costs "shall not be considered in a calculation of the forward-looking economic cost of an element"). Here, however, the rates were not used to determine the costs, i.e., the gross transportation rate. That gross figure was based on a forward-looking network model. The retail tariffs were only used to estimate a distribution between special and usage-based services. It is not clear that Rule 51.505(d)(2) prohibits the use of existing tariff rates in this manner.

We need not firmly resolve the question of whether this particular use of retail rates runs afoul of the Rule 51.505(d)(2) prohibition on considering retail costs. As already noted, the challenged method resulted in an allocation well within the range established by the unchallenged methods, and it was not arbitrary and capricious for the Nebraska Commission to select an allocation within that range. As a result, we affirm the district court and Commission as to the rate determination.

C.    Retroactive Compensation

The parties agree as to the effective date of the interconnection agreement (the date of approval by the Commission) and its duration. They disagree, however, as to whether compensation must be paid for any period of time that predates the effective date of the interconnection agreement. Great Plains sought compensation going back to approximately March 1998, a point in time well after Western began terminating calls on the Great Plains network and prior to the start of the parties' informal negotiations towards an interconnection agreement. Western sought a ruling that no compensation was due prior to finalization of the interconnection agreement.

The arbitrator found that compensation was due dating back to March 1998. In so finding, the arbitrator concluded that the agreements between Western and US West/Qwest (that enabled Western to terminate traffic to the Great Plains networks) made Great Plains a third party beneficiary and "were and are in the nature of 'interim arrangements' regarding Great Plains" and that Great Plains was a beneficiary under those agreements. The Commission agreed that compensation was owed to Great Plains. The Commission disagreed, however, that compensation was due dating back to 1998. Rather, the Commission found that Western's formal request for negotiation of an interconnection agreement under the Act was a precondition to any entitlement to reciprocal compensation. See 47 C.F.R. § 51.715(a)(2) (stating that "[a] telecommunications carrier may take advantage of such an interim arrangement only after it has requested negotiation with the incumbent LEC"). Accordingly, the Commission determined that the appropriate start date for compensation was the date that Western formally requested negotiation of an interconnection agreement under the Act: August 26, 2002. Because the Commission had held that reciprocal compensation was not owed by Great Plains for calls sent to a tandem switch (an issue later reversed by the district court and not appealed by Great Plains), the Commission found that Great Plains had not terminated any traffic to the Western network. As a result, the Commission held that Western owed Great Plains interim payments for traffic terminated on the Great Plains network, but that Great Plains owed Western no such interim compensation. The district court agreed with the Commission as to the appropriate date, but held that compensation was owed by each carrier to the other effective August 26, 2002.

Western appeals. Because this issue turns largely on the Nebraska Commission's interpretation of facts including the history of the parties' interconnection status and any arrangements that existed prior to the approval of an interconnection agreement, we apply the deferential standard of review. We will affirm the Nebraska Commission unless we find its ruling arbitrary and capricious.

The regulation that authorizes interim payments is 47 C.F.R. § 51.715. The Nebraska Commission correctly characterized this regulation as one that permits a carrier to request interconnection and transport and termination services, imposes a duty of timely cooperation on the incumbent carrier, and permits payments under an interim arrangement as a quid pro quo for the incumbent carrier's cooperation.[10]

[10]The regulation provides:

§ 51.715 Interim transport and termination pricing.

(a) Upon request from a telecommunications carrier without an existing interconnection arrangement with an incumbent LEC, the incumbent LEC shall provide transport and termination of telecommunications traffic immediately under an interim arrangement, pending resolution of negotiation or arbitration regarding transport and termination rates and approval of such rates by a state commission under sections 251 and 252 of the Act.

(1) This requirement shall not apply when the requesting carrier has an existing interconnection arrangement that provides for the transport and termination of telecommunications traffic by the incumbent LEC.

(2) A telecommunications carrier may take advantage of such an interim arrangement only after it has requested negotiation with the incumbent LEC pursuant to § 51.301.

(b) Upon receipt of a request as described in paragraph (a) of this section, an incumbent LEC must, without unreasonable delay, establish an interim arrangement for transport and termination of telecommunications traffic at symmetrical rates.

. . .

(d) If the rates for transport and termination of telecommunications traffic in an interim arrangement differ from the rates established by a state commission pursuant to § 51.705, the state commission shall require carriers to make adjustments to past compensation. Such adjustments to past compensation shall allow each carrier to receive the level of compensation it would have received had the rates in the interim arrangement equalled the rates later established by the state commission pursuant to § 51.705.

On appeal, Western presents an argument based on the plain text of the regulation. Western argues that rule 51.715 only applies when a carrier formally requests negotiations with an incumbent, seeks to establish an interim arrangement, and, in fact, establishes such an arrangement. Western characterizes the requirement for an "arrangement" as a requirement for a contract with offer, acceptance, definite terms, and consideration. Western then argues that because it did not at any time request to establish an interim arrangement with Great Plains, because the Commission did not affirmatively state that there was an interim arrangement, and because the Commission merely determined that "interim compensation is warranted," interim compensation is not authorized under the rule.

Great Plains counters that, through agreements with Qwest, Western, in fact, began terminating traffic to the Great Plains network as early as January 1997. Great Plains further states that an iteration of the agreement between Qwest and Western that became effective in July 2000 has been in force and effect throughout all times material to the question of interim compensation and makes Great Plains a third party beneficiary. Great Plains presented evidence to prove the number of minutes of traffic terminated by Western on the Great Plains network and Western did not dispute that evidence. Great Plains does not adopt the strict contract theory for interim arrangements as advocated by Western, and instead, states that the history of interim services between the parties—services that were actually provided in this case—suffices to prove the existence of an interim arrangement.

Great Plains also argues that, to the extent Western relies on the absence of a request for an interim arrangement to defeat interim compensation, Western's arguments are without merit. Western was, from January 1997 onward, obtaining termination and transport for telecommunications traffic on the Great Plains network without having asked Great Plains for such services. Great Plains argues that because an arrangement actually existed, there was no need for Western to ask for an arrangement.

No party disputes the actual rate set for interim compensation as an issue separate and distinct from their general challenges to the overall reciprocal compensation rate discussed above. In other words, there is no issue on appeal dealing specifically with the rate-setting provisions of Rule 51.715.

It is clear that the history of this case, involving transport and termination on the Great Plains network without a request from Western, differs from the situation envisioned by the FCC when the FCC fashioned Rule 51.715. That rule anticipates that competitors will approach incumbents to gain access, not that competitors will first terminate traffic and then discuss interconnection. It is also clear that Western received the benefit that the FCC sought to promote when it promulgated Rule 51.715—timely access prior to the negotiation of an interconnection agreement. We agree with Great Plains that nothing in Rule 51.715 mandates that an interim arrangement rise to the level of a definite contract between the parties. Such a requirement would be wholly incompatible with the interim, expedited nature of the actions demanded by the rule. The purpose of the rule is to permit parties to operate in the absence of a formal agreement, during a time that a formal agreement is being negotiated. As such, it was not arbitrary and capricious for the Nebraska Commission to find that interim compensation was due in this case, nor for it to select the date of Western's formal request for negotiations as a beginning date.

Finally, we agree with the district court that it is necessary to reverse the Commission to the extent that it limited interim compensation to one-way payments from Great Plains to Western. The rule explicitly calls for symmetrical compensation. 47 C.F.R. § 51.715(b). The Commission's ruling that Great Plains had not terminated any traffic to the Western Wireless network was based on the Commission's now-overruled determination regarding the scope of reciprocal compensation and the termination of traffic to the tandem switch. As we stated repeatedly above, traffic in both directions between an incumbent and a wireless carrier within a major trading area is subject to reciprocal compensation. Accordingly, the Commission erred as a matter of law when it found that traffic sent to a tandem switch and bound for the

Western Wireless network was not traffic terminated to the Western Wireless network. As a result, we agree with the district court and affirm its judgment as to this issue.

In summary, we affirm the district court in all respects. Local dialing parity is consistent with tandem routing and consistent with the Act, and the Commission erred as a matter of law when it approved contract language that excused Great Plains from the local dialing parity obligations of § 251(b)(3). The Nebraska Commission did not act arbitrarily or capriciously when it set the reciprocal compensation rate or the effective date for interim compensation. The Nebraska Commission did, however, err when it failed to make interim compensation symmetrical as required by 47 C.F.R. § 51.715.

_____