IOWA TELECOMMUNICATIONS SERVICES, INC. dba Iowa Telecom, Plaintiff,

v.

IOWA UTILITIES BOARD, Utilities Division, Department of Commerce; John Norris, Diane Munns and Curtis Stamp, in their Official Capacities as Members of the Iowa Utilities Board and not as Individuals; and Sprint Communications, L.P., dba Sprint Communications Company, L.P., Defendants.

Citizens Mutual Telephone Cooperative; Clear Lake Independent Telephone Company; Farmers Mutual Cooperative Telephone Co. of Shelby; Farmers Telephone Company; Grand River Mutual Telephone Corporation; Heart of Iowa Communications Cooperative; Huxley Communications; Kalona Cooperative Telephone; Lost Nation–Elwood Telephone Company; Mabel Cooperative Telephone Company; Minburn Telecommunications, Inc.; North English Cooperative Telephone Company; Rockwell Cooperative Telephone Association; Sharon Telephone; Shell Rock Telephone Company dba Bevcomm c/o Blue Earth Valley Telephone Company; South Central Communications, Inc.; South Slope Cooperative Telephone Company; Sully Telephone Association; Titonka Telephone Company;

Ventura Telephone Company, Inc.; Webster Calhoun Cooperative Telephone Association; Wellman Cooperative Telephone Association; West Liberty Telephone Company dba Liberty Communications; and Winnebago Cooperative Telephone Association, Plaintiffs,

v.

Iowa Utilities Board, Utilities Division, Department of Commerce; John Norris, Diane Munns and Curtis Stamp, in their Official Capacities as Members of the Iowa Utilities Board and not as Individuals; and Sprint Communications, L.P., dba Sprint Communications Company, L.P., Defendants.

Nos. 4:06cv0291 JAJ, 4:06cv0376 JAJ.

United States District Court, S.D. Iowa, Central Division.

April 15, 2008.

Robert F. Holz, Jr., Steven L. Nelson, Davis Brown Koehn Shors & Roberts PC, Des Moines, IA, for Plaintiffs.

David Jay Lynch, Mary Frances Whitman, Iowa Utilities Board, James L. Pray, Philip E. Stoffregen, Brown Winick Graves Gross Baskerville & Schoenebaum PLC, Des Moines, IA, Raymond A. Cardozo, Reed Smith LLP, San Francisco, CA, for Defendants.

## ORDER

JOHN A. JARVEY, District Judge.

### I. INTRODUCTION

This case comes before the Court pursuant to Iowa Telecommunications Service's ("Iowa Telecom") June 23, 2006 complaint (Docket No. 1), which was consolidated with an August 4, 2006 complaint by a

group of Rural Local Exchange Carriers ("RLECs").[1] (Docket No. 14). Iowa Telecom and the RLECs seek review of the Iowa Utilities Board's ("IUB") arbitrated interconnection agreement. (Docket Nos. 1–4). For the reasons set forth below, the Court finds for Defendants, upholding the decision of the IUB.

In an effort to increase competition in the provision of telecommunications services, particularly in rural areas, Congress enacted the Telecommunications Act of 1996, Pub. L. No. 104–104, 110 Stat. 56 (codified at 47 U.S.C. § 151 *et seq.* ) ("Telecommunications Act"). In this case, Sprint contends that it is a telecommunications carrier entitled to interconnect, under the Act, with local telephone companies so that it can compete with them. It secured a ruling from the IUB requiring local telephone companies to allow Sprint to interconnect.

The local telephone companies now seek declaratory relief, asking the Court to declare that Sprint is a not a telecommunications carrier and therefore, (1) Plaintiffs have no duty to negotiate with Sprint; (2) Plaintiffs have no duty to interconnect with Sprint; and (3) the parties' arbitrated interconnection agreement exceeds federal law. Plaintiffs also ask the Court to (4) void the IUB's arbitration order and subsequent arbitration; (5) enjoin the IUB and its members from enforcing the challenged orders; and (6) enjoin Sprint from enforcing the arbitrated interconnection.

Plaintiffs also ask the Court to rescind the IUB's November 28, 2005, Order on Rehearing, arguing that the board did not have jurisdiction to reopen and rehear the case. Last, the Plaintiffs seek to invalidate a provision of the arbitrated interconnection agreement that allows Sprint to commingle local, long-distance, and wireless telephone traffic on one interconnection trunk.

The Court finds that Sprint is a telecommunications carrier because it provides indiscriminate service to all potential customers. Therefore, Sprint is entitled to interconnection with Iowa Telecom and the RLECs. The Court finds that the IUB had jurisdiction to reopen and rehear the case. The Court also concludes that it was neither arbitrary nor capricious to allow Sprint to commingle multiple types of telecommunications traffic.

## II. BACKGROUND

### A. Statutory Background

Prior to the Telecommunications Act of 1996 ("the Act"), local phone service "was thought to be a natural monopoly." *See AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). States granted the exclusive right to provide local telephone service to a local exchange carrier, which are "local telephone company providing traditional landline phone services." *Alma Communs.*

---

**1.** The RLECs include Citizens Mutual Telephone Cooperative, Clear Lake Independent Telephone Company, Farmers Mutual Cooperative Telephone Co. of Shelby, Farmers Telephone Company, Grand River Mutual Telephone Corporation, Heart of Iowa Communications Cooperative, Huxley Communications, Kalona Cooperative Telephone, Lost Nation–Elwood Telephone Company, Mabel Cooperative Telephone Company, Minburn Telecommunications, Inc., North English Cooperative Telephone Company, Rockwell Co-

operative Telephone Association, Sharon Telephone, Shell Rock Telephone Company d/b/a Bevcomm c/o Blue Earth Valley Telephone Company, South Central Communications, Inc., South Slope Cooperative Telephone, Sully Telephone Association, Titonka Telephone Company, Ventura Telephone Company, Inc., Webster Calhoun Cooperative Telephone Association, West Liberty Telephone Company d/b/a Liberty Communications, Winnebago Cooperative Telephone Association.

*Co. v. Mo. PSC,* 490 F.3d 619, 620 (8th Cir.2007). The Act "fundamentally re-structure [ed]" telecommunications by per-mitting multiple carriers to provide tele-phone service in a local market. *AT & T,* 525 U.S. at 371, 119 S.Ct. 721. To do this, the Act imposes "specific duties" on incum-bent carriers "[t]o facilitate the market entry of competitors and ensure the inte-gration of competitors' networks with in-cumbents' networks." *WWC License, L.L.C. v. Pub. Serv. Comm'n,* 459 F.3d 880, 884 (8th Cir.2006) (citing 47 U.S.C. § 251(c)(1)(6)).

One of those duties is the duty of inter-connection. Existing telecommunications carriers are required to interconnect, di-rectly or indirectly, with any requesting telecommunications carrier.[2] 47 U.S.C. § 251(a). Interconnection allows custom-ers of multiple carriers to exchange tele-phone traffic. Without interconnection, the transport and termination of calls would be much more costly. The Act also set up a reciprocal compensation scheme in which "[t]he carrier for the party originat-ing the call is compensated by its custom-er, the caller." *Alma Communs.,* 490 F.3d at 621; 47 U.S.C. § 251(b).

In order for a carrier (i.e. Sprint), to assert the rights of interconnection, the carrier must be a "telecommunications car-rier" as defined by the Act. The Act de-fines a telecommunications carrier as "any provider of telecommunications services, except that such term does not include aggregators of telecommunications ser-vices." Section 153(46), in turn, defines "telecommunications services" as "the of-fering of telecommunications for a fee di-rectly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." *Id.* § 153(46).

The first step a telecommunications car-rier must take to assert rights of intercon-nection is to request interconnection with the local exchange carrier(s), in this case Iowa Telecom and the RLECs. 47 U.S.C. § 252(a). The carriers then may "negoti-ate and enter into a binding agreement with the requesting telecommunications carrier." *Id.* § 252(a)(1). If negotiations fail, either party "may petition a State commission to arbitrate any open issues" between the 135th and 160th day after the LEC receives the request for negotiation. *Id.* § 252(b)(1). The state commission then "resolve[s] each issue set forth in the petition" and, if necessary, compels inter-connection. *Id.* § 252(b)(4)(C). The state commission must then approve an inter-connection agreement between the parties. *Id.* § 252(e)(1). Either party may then seek judicial review of the arbitrated inter-connection agreement in the appropriate federal district court. *Id.* § 252(e)(6). Here, Plaintiffs Iowa Telecom and the RLECs seek judicial review of the IUB-approved interconnection agreement with Sprint, arguing that it violates federal law.

**B. The Sprint–MCC Model in Iowa**

Local telephone service consists of three primary components: (1) the system of wires and cables that takes the phone call from the user's premises to the connection point; this is referred to as "last-mile" or "loop" services; (2) a switch that gathers and distributes the telephone traffic; and (3) a facility to interconnect calls to and from other carriers. Sprint has developed a business model in which it works togeth-er with a local cable company to provide these services. Here, the local cable com-pany is MCC Telephony of Iowa, L.L.C.

---

**2.** "As the labels suggest, direct connections between carriers involve actual physical points of interconnection between networks; indirect connections involve connections via third parties' networks." *WWC License,* 459 F.3d at 884.

("MCC"), an affiliate of Mediacom. Under this arrangement, Sprint provides the switching and interconnection functions,[3] while MCC provides the system of cables to carry calls to and from the switch and the "end-user."[4]

In addition to providing last-mile facilities, MCC is also in charge of all sales, billing, and customer service. In this model, Sprint has no direct relationship with the customer, nor do they provide any retail services. MCC solely interacts with customers. Sprint's role is to provide wholesale telecommunications services which MCC retails. Sprint believes this model is advantageous to both companies because it allows them to quickly and efficiently enter the market and not duplicate resources.

Based on this business model, Sprint argues that they are a telecommunications carrier, giving them the right to interconnect with local exchange carriers under Section 251(a) of the Telecommunications Act.

### C. Procedural History

On October 20, 2004, Sprint requested interconnection negotiations with various RLECs in Iowa. Sprint sought an interconnection agreement to use not only for its business with MCC, but also with other similarly situated cable providers. *See In re Arbitration of Sprint Comm. Co., L.P. v. Ace Comm. Group*, ARB–05–2, at 10, 2005 WL 3624405 (Iowa Util.Bd. Nov. 28, 2005) (discussing the purpose behind Sprint's interconnection request). The RLECs objected, however, characterizing Sprint as "merely one of many suppliers of resources needed by MCC to provide local

exchange service." *Id.* The RLECs wanted an interconnection agreement with MCC or with Sprint as MCC's agent. *Id.* Sprint made clear that it was not acting as MCC's agent or partner; it sought interconnection in its own right, albeit through its relationship with MCC. *Id.*

After an unsuccessful negotiation, Sprint filed a petition for arbitration with the IUB on March 31, 2005 pursuant to § 252(b)(1) of the Telecommunications Act. *See* 47 U.S.C. § 252(b)(1). In response, Iowa Telecom and the RLECs filed a motion to dismiss, arguing that (1) Sprint's arbitration request was untimely; and (2) Sprint was not a "telecommunications carrier" as defined by the Act. The IUB found the petition was timely but Sprint was not a telecommunications carrier because "it [was] not, in this context, holding itself out as a common carrier." (R. No. 7 at 9). "[I]t is clear that Sprint does not intend to offer its proposed service in the RLEC exchanges to any party other than its private business partners, pursuant to individually-negotiated contracts." (R. No. 7 at 13). The IUB also found that Sprint was not a local exchange carrier, and thus cannot demand interconnection. Accordingly, the IUB granted the RLECs' and Iowa Telecom's motion to dismiss.

Sprint filed a complaint in this court on June 23, 2005, asking the court to overturn the IUB's May 26, 2005, Motion to Dismiss. (R. No. 23 at 3). During the course of those proceedings, Sprint and the IUB determined that there were unresolved evidentiary and legal issues relevant to the IUB's Motion to Dismiss. Upon a request to reopen proceedings before the IUB, this

---

**3.** Sprint will also provide many other ancillary back-office functions, including database administration, directory listings, numbering resources, inter-carrier compensation, and all regulatory issues such as the one in this case. Through its interconnection functions, Sprint will also route 911 calls, long-distance calls, and operator and directory assistance.

**4.** The term "end-user" refers to a home or business that subscribes to MCC's services.

Court stayed proceedings. On August 18, 2005, the court remanded the case to the IUB for 60 days to give the IUB an opportunity to hear evidence and legal arguments.

The RLECs and Iowa Telecom filed a Motion to Dismiss and Re–Close Docket (R. No. 11), arguing that under Iowa administrative law, the IUB did not have jurisdiction to reopen the case (R. No. 11 at 3–4). On October 10, 2005, the IUB denied the motion, finding that the "Board's jurisdiction [is] based on the federal Act" (R. No. 22 at 6). According to the IUB, the federal court has exclusive jurisdiction to "review '*any* case in which a State commission *makes a determination under this section....* ' " (R. No. 22 at 6) (emphasis in original). Because the federal court had jurisdiction, it also had the authority to remand the case to the IUB. *Id.*

The IUB conducted a hearing on the matter, and on November 28, 2005, the IUB issued its order on rehearing, rescinding its previous order. It found that Sprint is a telecommunications carrier because it "indiscriminately offer[ed] its services to a class of users so as to be effectively available to the public." (R. No. 30 at 14). The IUB defined the "class of users" as "entities capable of offering their own last-mile facilities." *Id.* The IUB found it immaterial that Sprint tailored its contracts to each individual customer, such as MCC. *Id.* at 14–15. The IUB ordered arbitration proceedings. *Id.* at 16.

This court remanded the case to the IUB on January 4, 2006. (R. No. 58 at 3). On March 24, 2006, the IUB issued an arbitration order, directing the parties to submit interconnection agreements. (R. No. 58). The Board approved the parties' interconnection agreement on May 24, 2006. (Docket No. 1–4). Iowa Telecom filed a complaint in this court against Sprint and the IUB on June 23, 2006. (Docket No. 1). On August 4, 2006, the RLECs filed a similar complaint for declaratory and injunctive relief with this court. (No. 4:06–cv–00376, Docket No. 1). The court consolidated the cases on September 5, 2006. (Docket No. 14).

## III. CONCLUSIONS OF LAW

### A. Whether Sprint is a Telecommunications Carrier

#### 1. Standard of Review

■■■ This court reviews the IUB's legal conclusions *de novo*. *See WWC License, LLC v. Pub. Serv. Comm'n*, 459 F.3d 880, 889–90 (8th Cir.2006). The Court "owes no deference to the [IUB's] interpretations of federal law ... and our review of the agreement for compliance with the Act is de novo." *Id.* Mixed questions of law and fact are reviewed under a deferential standard, affirming unless arbitrary and capricious. *Id.* (citing *Qwest Corp. v. Koppendrayer*, 436 F.3d 859, 863 (8th Cir.2006)).

#### 2. Standard for Declaratory and Injunctive Relief

■■■ Plaintiffs seek declaratory relief, asking the court to declare that Sprint is not a telecommunications carrier and to void Sprint's right to interconnection. A federal court may "declare the rights and other legal relations" in a "case of actual controversy." 28 U.S.C. § 2201 (2007). An actual controversy exists where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 S.Ct. 764, 771, 166 L.Ed.2d 604 (2007) (quoting *Maryland Casualty Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941) (internal

quotations marks omitted)). There are adverse legal interests between the parties in this case. The plaintiffs, Iowa Telecom and the RLECs, do not want to interconnect with Defendant Sprint because Sprint is a competitor. There is a substantial controversy regarding the interpretation of the Telecommunications Act of 1996. Therefore, the Court may appropriately review Plaintiffs' request for declaratory relief.

■ Plaintiffs seek to enjoin the IUB and its members in their official capacity from enforcing the challenged arbitration order. (Complaint at 9). Injunctive relief is appropriate where a plaintiff requests that a "state official [ ] be restrained from enforcing an order in contravention of controlling federal law." *Verizon Md., Inc. v. Pub. Srv. Comm'n,* 535 U.S. 635, 645–46, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002). In making this determination, the court must make a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Id.* (quoting *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 296, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997)) (internal quotation marks omitted). The Complaint alleges that the arbitrated interconnection agreement violates Section 251(a) of the Telecommunications Act. If the Court finds that the agreement contravenes federal law, it is appropriate to enjoin the IUB and its members, in their official capacity, from enforcing them.

### 3. Whether Sprint is a Common Carrier

■ In order to both compel interconnection and demand arbitration, Sprint must be a "telecommunications carrier" for purposes of Sections 251 and 252 of the Act. A "telecommunications carrier" is "any provider of telecommunications services." 47 U.S.C. § 153(44). "Telecommunications service" is defined as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be directly to the public, regardless of the facilities used." *Id.* at § 153(46). To determine whether a provider is offering services "directly to the public," the Federal Communications Commission ("FCC") and various courts have applied a "common carrier" test. *See In re AT & T Submarine Sys., Inc.,* 11 FCC Rcd. 14885 (1996); *Iowa v. FCC,* 218 F.3d 756, 758 (D.C.Cir.2000); *Virgin Islands Tel. Corp. v. FCC,* 198 F.3d 921, 926–27 (D.C.Cir.1999) (*"Virgin Islands"*). Under this test, a provider cannot be a telecommunications carrier unless it is a common carrier. *Iowa,* 218 F.3d at 758. The test for common carriage is two-fold: the carrier must (1) hold itself out indiscriminately or indifferently to the clientele it serves; *Nat'l Ass'n of Regulatory Util. Comm'r v. FCC,* 525 F.2d 630, 641 (D.C.Cir.1976) (*"NARUC I"*); and (2) have a system that allows "customers [to] 'transmit intelligence of their own design and choosing.'" *Nat'l Ass'n of Regulatory Util. Comm'r v. FCC,* 533 F.2d 601, 609 (D.C.Cir.1976) (*"NARUC II"*) (quoting *Indus. Radiolocation Serv.,* 5 F.C.C.2d 197, 202 (1966)).

Here, Plaintiffs argue that Sprint fails the first prong of the common-carrier test because it does not serve its clientele indiscriminately. Plaintiffs contend that because Sprint negotiates individual contracts and keeps its prices, terms and conditions confidential, it provides service on a discriminate basis. Plaintiffs also argue that the IUB erred when it found that Sprint serves all in its class of users; they contend that the only user is MCC.

Sprint responds by asking the Court not to look at its relationship with MCC and similar cable companies, but to look at

Sprint's relationship with the end-user of its services—homes or businesses that subscribe to MCC service. Sprint contends that together with MCC, it will provide indiscriminate service to the public. Alternatively, Sprint argues that it is a common carrier if the Court only considers Sprint's customers—MCC and other similarly situated cable companies with last-mile capabilities. Sprint's position is that it need not serve the entire public, it only needs to serve all in the applicable class of users. Sprint argues that it has aggressively marketed its services to all potential companies. It contends that the fact that it negotiates individual, confidential contracts reflects the nature of the business and does not negate its common-carrier status.

### a. Sprint's Relationship with Cable Companies

■ The first issue is whether the Court should assess Sprint's relationship with its own customers or Sprint's relationship with MCC's customers in determining whether Sprint offers service indiscriminately. The Court owes deference to a recent ruling by the FCC on this issue.[5] After the parties submitted their opening briefs on the merits, the FCC issued an advisory ruling addressing a nearly identical relationship between Sprint and Time Warner Cable ("TWC") in Nebraska, and between TWC and MCI WorldCom Network Services ("MCI") in South Carolina. *In re Time Warner Cable Request for Declaratory Ruling*, 22 FCC Rcd. 3513 (2007) (*"In re TWC"*). Like MCC, TWC provided the last-mile facilities and cus-

tomer service, while Sprint in Nebraska and MCI in South Carolina provided the interconnection and switching functions. After the public utilities commissions in those states forbade interconnection, TWC sought an advisory ruling from the FCC. *Id.* While not addressing the specific facts of either case, the agency clarified that wholesale telecommunications providers are entitled to interconnection under Section 251. *Id.* at 3517, ¶ 9. "[T]he Act does not differentiate between the provision of telecommunications services on a wholesale or retail basis for the purposes of sections 251(a) and (b), and we confirm that providers of wholesale telecommunications services enjoy the same rights as any 'telecommunications carrier' under those provisions of the Act." *Id.*

The FCC also held that a wholesale provider may provide common-carriage services to its own customers; it need not look to its customers' customers. "[C]ommon carrier services include services offered to other carriers, such as exchange access service, which is offered on a common carrier basis, but is offered primarily to other carriers." *Id.* at 3519, ¶ 12 (quoting *In re Federal–State Joint Board on Universal Service*, 12 FCC Rcd. 8776, 9178, ¶ 785 (1997)) (internal quotations marks omitted) (*"Universal Service"*). The FCC rejected the South Carolina Public Utilities Commission's conclusion that a "carrier directly serving the end user customer is the only carrier entitled to request interconnection." *Id.* at 3518 n. 23.

---

**5.** The Court owes "deference to the [FCC] based on the fact that Congress expressly charged the FCC with the duty to promulgate regulations to interpret and carry out the Act." *WWC License, L.L.C. v. Pub. Serv. Comm'n*, 459 F.3d 880, 890 (8th Cir.2006) (citing *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 378, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999)); *see also Alma Communs. Co. v. Mo. PSC*, 490 F.3d 619, 624 (8th Cir.2007) ("In

our interpretation of the Telecommunications Act, we defer to existing interpretations by the FCC, which Congress authorized to interpret and administer the Act."). The Court should defer to the FCC's interpretation unless their construction of the statute is "contrary to clear congressional intent." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The FCC stated, "The South Carolina Commission's interpretation—that services provided on a wholesale basis to carriers or other providers are not telecommunications services because they are not offered 'directly to the public' has been expressly rejected." *Id.* at 3517–18 ¶ 11. The FCC made clear that a wholesale provider can provide service to its customers, other carriers. While the FCC did not directly state which relationship should be analyzed when determining Sprint's status, the Court finds that because a wholesale carrier can provide "telecommunications service" to its customers, it is that relationship that is indicative of Sprint's status as a common carrier. The Court should not look to the indiscriminate nature of MCC's service to the end-user, but must look at the indiscriminate nature of Sprint's service to other carriers.

This conclusion is also supported by FCC and federal precedent. *See Universal Service Order* 12 F.C.C. Rcd. at 9178 (holding that a carrier may be a common carrier if it "serv[es] indifferently all potential users," and potential users "are not limited to end users"); *In re Implementation of the Non–Accounting Safeguards,* 11 FCC Rcd. 21905, 22033, ¶ 265 (1996) ("Common carrier services include services offered to other carriers."). In *Virgin Islands v. FCC,* the D.C. Circuit said that it was inappropriate to "look to the customers' customers to determine the status of the carrier." *Virgin Islands,* 198 F.3d at 925. In doing so, the Court affirmed the same conclusion by the FCC. *See In re AT & T Submarine Sys., Inc.,* 11 FCC Rcd. 14885, 14892 ¶ 26 (1996) (license order) (looking to the customers' customer "would be contrary to the plain language of the statute"); *In re AT & T Submarine Sys., Inc.,* 13 FCC Rcd. 21585, 21588 ¶ 6 (1998) (agency review of license) (declining to "introduce a new concept whereby we must look to the customers' customers to deter-mine the status of a carrier"). Together, these cases, along with *In re TWC,* indicate that this Court should evaluate Sprint's relationship with MCC and like cable companies and not Sprint's relationship with MCC's customers, the end-users.

### b. *The Availability of Sprint's Services*

■ The Court finds that Sprint offers service indiscriminately to MCC and other cable companies with last-mile capabilities. A telecommunications provider may be a common carrier even though its service may be "of possible use to only a fraction of the population." *In re TWC,* 22 FCC Rcd. at 3518 ¶ 12 (citing *NARUC I,* 525 F.2d at 641). "[A] carrier offering its services only to [a] legally defined class of users may still be a common carrier if it holds itself out indiscriminately to serve all within that class." *Iowa,* 218 F.3d at 760; *see also NARUC II,* 533 F.2d at 608 (declining to find a requirement that service must "practically be available to the entire public; a specialized carrier whose service is of possible use to only a fraction of the population may nonetheless be a common carrier if he holds himself out to serve indifferently all potential users"). The distinction between a common carrier and private carrier is not necessarily about *how many* the carrier serves, but the nature in which the carrier provides service. *See NARUC I,* 525 F.2d at 641 ("The critical point is the quasi-public character of the [service] involved.").

After an evidentiary hearing, the IUB found that "Sprint is willing to provide wholesale services to any last-mile retail service provider that wants Sprint's services in Iowa." *In re Arbitration of Sprint Comm. Co., L.P. v. Ace Comm. Group,* No. ARB–05–2, at 14, 2005 WL 3624405 (Iowa Util.Bd. Nov. 28, 2005) (Docket No. 1–3)

("*Order on Rehearing*"). In summarizing the evidence, the IUB stated:

> Sprint will offer its interconnection services to all entities similarly situated to MCC with last-mile facilities to the cable companies. Through these arrangements Sprint provides services to all within the class similar to MCC to allow those services effectively to be offered to the public.

*Id.* Based on this factual finding, to which the Court defers (*see* Part III. A.1 *supra*), the Court finds that Sprint makes its services available to all in the subset of last-mile service providers such as MCC.

Plaintiffs argue that the IUB had no support for this conclusion. In the IUB's first order on May 26, 2005, the board stated, "[I]t is clear that Sprint does not intend to offer its proposed service in the [Plaintiffs'] exchanges to any party other than its private business partners, pursuant to individually negotiated contracts." *In re Arbitration of Sprint Comm. Co., L.P. v. Ace Comm. Group,* No. ARB–05–2, at 13, 2005 WL 1415230 (Iowa Util.Bd. May 26, 2005). Plaintiffs contend that there is no support for the IUB's conclusion to the contrary in its Order on Rehearing. The Court disagrees, finding ample evidence in the record to support this conclusion. The evidence includes testimony by James Burt, Director of Regulatory Policy for Sprint, who stated several times that Sprint intends to offer its services to any applicable cable company. "Sprint will provide the same services to all within the class similar to MCC to allow those services to be offered to the public...." (Tr. 1 at 22).[6] "We are offering these services to all cable companies or anybody similarly situated." (Tr. 2 at 143). "That means, Sprint intends to provide the interconnection services to all en-

tities who desire to take them and who have comparable 'last mile' facilities to the cable companies." (Tr. 1 at 22). "We have a big network. We'd like to provide our service to as many people as we can, get as much traffic on that network as possible." (Tr. 2 at 145).

Burt also described Sprint's efforts to market its telecommunications service to cable companies with last-mile facilities. He stated that company representatives attended several trade shows in order to "convey to as many cable companies as possible that Sprint was interested in forming relationships to provide competitive voice services." (Tr. 1 at 20). Burt also described a Sprint marketing brochure:

> This is a marketing brochure that Sprint uses to introduce cable companies or any other entity that may have last mile facilities similar to a cable company to the breadth of services that Sprint has to provide to them. . . . It is targeted to cable companies . . . but other providers of service can purchase these services as well.

(Tr. 2 at 151). This evidence supports the board's conclusion that Sprint will offer its services to "all entities similarly situated to MCC with last-mile facilities to the cable companies." *In re Arbitration of Sprint,* No. ARB–05–2, at 14. The IUB's fact-finding was not arbitrary or capricious; accordingly, the Court affirms the IUB's findings.

### c. The Effect of Individually Negotiated and Confidential Contracts

Recognizing that Sprint's services are available to all or nearly all cable companies with last-mile capabilities, the next

---

**6.** "Tr. 1" refers to the Pre–File Testimony of James Burt, dated August 26, 2005. (R. No. 10). "Tr. 2" refers to the transcript from the Oct. 18, 2005 hearing before the IUB.

issue is the effect of individually negotiated contracts. Plaintiffs contend that "[t]he hallmark of common carriage is generally available, publicly displayed rates, terms, and conditions for a service." (Pl. Br. at 12). Defendants disagree on two points. They argue that (1) individually negotiated contracts are necessary because each cable company mixes and matches Sprint's many services to tailor to the company's needs; and (2) published rates and conditions would decrease its competitive edge. Increased competition, Defendants argue, is the foremost purpose of the Telecommunications Act. The Court agrees with Defendants for those two reasons.

First and most importantly, the purpose of the 1996 Telecommunications Act is to create a "pro-competitive, de-regulatory national framework designed to accelerate rapid private sector deployment of ... technologies and services to all Americans by opening all telecommunications markets to competition." S. Conf. Rep. No. 104–230, 104th Cong., 2d Sess. 1 (1996), U.S.Code Cong. & Admin.News 10 (quoted in *In The Matters of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996,* 11 FCC Rcd. 19392 (1996)); *see also Verizon Md., Inc. v. PSC,* 535 U.S. 635, 638, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) ("Telecommunications Act of 1996 ... created a new telecommunications regime designed to foster competition in local markets."); *WWC License,* 459 F.3d at 884 ("With the Act, Congress moved to abolish the system of monopolies in favor of a competitive system with multiple potential carriers."); *Covad Communs. Co. v. FCC,* 450 F.3d 528, 531 (D.C.Cir.2006) ("The 1996 Act sought to foster a competitive market in telecommunications."). The Supreme Court explained the Act's goals in *Verizon Communications, Inc. v. FCC,*

> [The Telecommunications Act] is a de-regulatory statute seeking competition.

It assumes that, given modern technology, local telecommunications markets may now prove large enough for several firms to compete in the provision of some services—but not necessarily all services—without serious economic waste. It finds the competitive process an indirect but more effective way to bring about the common objectives of competition and regulation alike, namely low prices, better products, and more efficient production methods.

*Verizon Communs., Inc. v. FCC,* 535 U.S. 467, 543–544, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002).

Applying these goals to the Sprint business model, Sprint will be more competitive if it is able to keep its prices, terms and conditions confidential. This concept has been acknowledged by the FCC, which has previously stated that publicly displayed rates, commonly filed in a "tariff," often decrease competition. "The Commission has long been concerned that the necessity of filing tariffs hinders competitive responsiveness ... [and] the filed-rate doctrine has been used by the carriers as a shield to avoid individual contract negotiations with large and small users, thereby reducing competition among carriers." *MCI WorldCom, Inc. v. FCC,* 209 F.3d 760, 764 (D.C.Cir.2000), *quoted in Iowa Network Servs. v. Qwest Corp.,* 466 F.3d 1091, 1098 (8th Cir.2006) (internal quotations marks omitted) (alteration in original). Therefore, labeling Sprint as a telecommunications carrier, while allowing it to engage in private, negotiated contracts with confidential prices and terms will allow Sprint to be more competitive with its offerings.

Second, the unique nature of Sprint's services is important. Under a traditional telecommunications model contemplated at the time of the 1996 Act, the carrier was

typically a telephone company that provided telephone service directly to a home or business. Its offerings were straight-forward and easy to price and quantify. Here, Sprint's customers are cable companies. Its offerings are not just long-distance phone service or call waiting, but complex systems of equipment and services that Sprint tailors to each customer's needs. As the IUB explained in its Order on Rehearing:

> [T]he network configurations will not be identical for each entity that intends to use Sprint's services, because different carriers will have different requirements. (Tr. 39.) ... The contracts Sprint has entered into with cable companies to date reflect 'a lot of material differences in the business relationship that Sprint has with the cable companies or any other similarly situated company. . . .' (Tr. 61–62.) As a result, the pricing is different in each of these contracts. (Tr. 64.).

*Order on Rehearing,* No. ARB–05–2, at 7–8. Based on the specialized nature of the offerings, it would be unduly restrictive and contrary to the goal of competition to forbid Sprint from engaging in individualized, private negotiations. The Court is also concerned that if Sprint's offerings were not considered common-carrier services (and thus, telecommunications services), telecommunications companies would have less incentive to develop innovative and efficient offerings as Sprint has here. Conversely, by calling these services "telecommunications services" and allowing interconnection, the Act's goals of competition, "low prices, better products, and more efficient production methods" is furthered. *Verizon Communs.,* 535 U.S. at 544, 122 S.Ct. 1646.

For the foregoing reasons, the Court finds that Sprint provides telecommunications service and therefore is a telecommunications carrier. Under Section 251(a) of the Telecommunications Act, Sprint is entitled to interconnection with Iowa Telecom and the RLECs. The Court affirms the IUB's November 28, 2005 Order on Rehearing, as well as the IUB's arbitration order and approved interconnection agreement.

## B. Whether the Iowa Utilities Board Exceeded Its Jurisdiction

■ Plaintiffs next argue that the IUB lacked jurisdiction to alter, amend, or change its May 26, 2005 dismissal order. They argue that the IUB's actions were contrary to the Iowa Administrative Procedures Act, which states that a party must submit an application for rehearing within twenty days of an agency's final decision or an application for judicial review within thirty days. Iowa Code § 17A.16(2) (2006). Defendants respond that the IUB had authority to rehear this case because it was remanded from the federal district court, which has authority to review all state commission decisions under Sections 251 and 252 of the Telecommunications Act. The Court finds that the IUB had authority to rehear the case because (1) the federal court granted jurisdiction to the IUB; and alternatively, (2) Sprint filed a timely petition for judicial review.

■ The core of the dispute is the source of the IUB's authority to reopen and review its May 26, 2005 order. It is well-settled law that agencies only possess powers conferred by statute, they do not possess inherent powers. *New York v. Fed. Energy Regulatory Commission,* 535 U.S. 1, 18, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002) ("an agency literally has no power to act ... unless and until Congress confers power upon it." (internal quotation marks and citations omitted)). The Telecommunications Act of 1996 grants authority to state commissions to arbitrate and approve interconnection agreements.

"[T]he carrier or any other party to the negotiation may petition a State commission to arbitrate any open issues." 47 U.S.C. § 252(b). "Any interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission." *Id.* at § 252(e). After the state commission makes such a determination, an aggrieved party may seek judicial review "in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 and this section." 47 U.S.C. § 252(e)(6). Thus, the Telecommunications Act creates a unique system of shared state and federal power, which has been characterized as a "federal program administered by fifty independent state agencies." *AT & T Corp.*, 119 S.Ct. at 730 n. 6.

Sprint sought review of the IUB's order in this Court on June 23, 2005. (No. 4:05–cv–00354, Docket No. 1). This Court remanded the case to the IUB to resolve factual and legal issues not contemplated at the time of the IUB's dismissal order. The question is whether the IUB had authority to rehear the case. The Iowa Administrative Procedures Act states, "An agency shall have only that authority or discretion delegated to or conferred upon the agency by law and shall not expand or enlarge its authority beyond the powers delegated to or conferred upon the agency." Iowa Code § 17A.23 (2006). This Court remanded this case and conferred power to the IUB; accordingly, the IUB had authority to rehear the case. Jurisdiction was proper.

Alternatively, the Court finds that Sprint sought judicial review in a timely manner. Plaintiffs contend that the dismissal order became final because Sprint did not file a petition for rehearing within twenty days, nor did they file a petition for judicial review within thirty days, as required by the Iowa Administrative Procedures Act. Iowa Code §§ 17A.16(2) (rehearing); 17A.19(3) (judicial review); *see also Kash v. Iowa Dep't of Employment Services,* 476 N.W.2d 82, 83 (Iowa 1991) ("[O]nce the time periods have passed an agency is without further power to act."); *City of Des Moines Police Dep't v. Iowa Civil Rights Commission,* 343 N.W.2d 836, 839 (Iowa 1984) ("Once an agency decision has become final, there is no statutory authorization for subsequent agency review.").

However, Sprint sought judicial review in this Court twenty-eight days after the IUB issued its dismissal order. Even though Sprint sought judicial review in the manner prescribed by the Telecommunications Act, Plaintiffs nevertheless argue that Sprint did not seek judicial review. Their argument implies that Sprint should have sought judicial review in one of the state district courts in order to keep the IUB's order from becoming final. Section 17A.19 of the Iowa Code states that judicial review of agency decisions are initiated by "filing a petition either in Polk county district court or in the district court for the county in which the petitioner resides or has its principal place of business." Iowa Code § 17A.19(2). However, state-court review would have been futile as "[s]tate courts do not have jurisdiction to review decisions of state commissions 'approving or rejecting an agreement' under § 252 [of the Telecommunications Act.]." *Southwestern Bell Telephone Co. v. Connect Communications Corp.,* 225 F.3d 942, 944 (8th Cir.2000). To require Sprint to file a petition for judicial review in the state district courts would be pointless. Section 252(e)(6) specifically prescribes the manner for judicial review. Sprint filed its petition in accordance with Section 252(e)(6). To preclude judicial review would frustrate the purpose of the statute. The drafters of the Act intended a careful

balance of state and federal power, with the federal courts as the final check on the state agencies' decisions.

The Court concludes that the IUB's May 26, 2005 dismissal order was not final because Sprint timely and appropriately sought judicial review in the federal district court as the Telecommunications Act provides. Therefore, the IUB did not exceed its power when it reopened and reheard the case.

### C. Validity of Board–Ordered Commingling Provisions

Plaintiffs next seek to invalidate a provision in the arbitrated interconnection agreement that allows Sprint to commingle local and non-local traffic on one interconnection trunk. Traditionally, Sprint would separate and send such traffic over different trunks. Local traffic and non-local traffic are compensated differently and the RLECs are concerned that they will not be adequately compensated if the two types of traffic are combined. However, Sprint presented evidence that it is developing technology to enable it to identify the different types of traffic and appropriately rate it. The IUB found that the development of this technology is sufficiently advanced to allow Sprint to combine calls on one interconnection trunk, otherwise known as "commingling" the traffic. Plaintiffs argue that the IUB's decision to commingle traffic was unsupported by the record and arbitrary and capricious.

Plaintiffs contend that this is a mixed question of law and fact. However, they only appeal the IUB's assessment of Sprint's technology. This is a factual determination that the Court will review under the arbitrary and capricious standard due to the agency's "superior technical expertise." *Ace Tel. Ass'n v. Koppendrayer,* 432 F.3d 876, 878 (8th Cir.2005); *see also WWC License,* 459 F.3d at 889–90; *Qwest Corp. v. Koppendrayer,* 436 F.3d at 863. This Court will uphold the IUB's factual determination if supported by substantial evidence. *Ace Tel. Ass'n,* 432 F.3d at 880.

The parties originally agreed that the interconnection agreement was only to be used for local traffic. Section 21.2 of the arbitration agreement stated, "Neither party will deliver nonlocal traffic to the other party on the local interconnection." (Arbitration Agreement, Provision 21.2). Local traffic was defined as "two-way wireline telephone exchange traffic exchanged between the parties that originates and terminates within the ILEC local calling area...." (Tr. 3 at 166).[7] At the February 8, 2006 hearing, Sprint objected to the agreed language and sought to add language that would permit Sprint to terminate multiple types of traffic on the interconnection trunk. The RLECs contend that expanding the agreement to encompass multiple types of traffic will create a host of new problems "generally referred to as the 'phantom traffic' issue." (Pl. Br. at 28). "Phantom traffic" is a term that describes traffic "where the carrier is unknown or the jurisdictional nature of the call is unknown."[8] *Verizon Wireless (VAW) LLC v. Kolbeck,* 529 F.Supp.2d 1081, 1092 (S.D.2007).

At the hearing before the IUB, the Sprint witness stated that Sprint was "de-

---

7. "Tr. 3" refers to the transcript from the IUB's February 8, 2006 hearing.

8. Sprint, however, argues that this is not a "phantom traffic" issue: "I think phantom traffic is traffic terminated to a party, and you don't know who the originating party is.

That is not what Sprint is saying. Sprint is fully—making it fully clear where this traffic is coming from. It is our traffic subject to the interconnection agreement, and we'll pay the appropriate rates. It's not phantom traffic." (Tr. 3 at 171).

veloping [a] system that will give us the ability to measure all of the traffic going over those trunks and jurisdictionalize it properly." (Tr. 3 at 194). By properly identifying and measuring the traffic, Sprint would be able to appropriately compensate the RLECs. The Sprint witness explained their current level of development,

Q. So you're saying today you can't identify the jurisdiction?

A. We can identify some of it. We have current projects underway to develop the ability to generate records such that you will trust our factors.

Q. And Sprint does not have that today?

A. We're working on it, yes.

(Tr. 3 at 171). The witness further explained Sprint's system,

Q. Traditionally our switches are separate, so we have wireless switches and wireline switches. Our network is converging, so we would have one switch that would handle both traffic types, so we have to have the ability to distinguish at the record level what's wireless and wireline. That development is underway at Sprint. It includes not only the network configuration, but also the systems that support that, and there are some projects that are going to be completed in the April time frame.... [We] understand that we have to have the ability to show what traffic is what, and that's the work that's underway.

(Tr. at 194–95). In response, the RLEC's witness testified regarding the development of such technology,

I just don't think that [Sprint has] the ability to identify it.... I'm personally skeptical because people have been looking at this for a long time. I've been looking at it within our company on ways to try to fix this through other companies that we represent, and we haven't come up with a solution yet, so all I know is that what Sprint talked about was pretty general. I haven't heard any specifics on how it would work, but like I said, I would be skeptical that anything could come about soon.

(Tr. 3 at 393–94).

Based on this testimony, the IUB approved the commingling provision, stating, "Because Sprint has indicated that it is technically possible to perform the measurement of traffic, but that it simply has not yet implemented those procedures, the Board will approve provisions related to commingling various types of traffic on individual trunks." (Arbitration Order at 16). The testimony above supports this conclusion. The Sprint witness testified that it was in the process of developing such technology, some of which would be available by April, which was only two months from the time of the hearing. There was also testimony that Sprint would not combine the traffic until the technology was available to identify it.[9] (Tr. 3 at 161). The IUB simply allowed Sprint to insert a clause that would forego the need for future negotiations and modifications of the agreement. Because the IUB's decision was supported by evidence in the record that Sprint would soon be capable of identifying the traffic, as well as evidence that Sprint would not commingle

9. "We don't suggest that we start sending this traffic before we have the ability to do this, because then we get into all those compensation issues, which we know that's a place we don't want to go ... As I stated, when we can demonstrate that we can identify the traffic in a manner that is used in the industry today to identify different jurisdictions, I think that gets us where we need to go." (Tr. 3 at 197).

traffic until the technology was available, it was not arbitrary nor capricious to allow the commingling provision. The Court upholds the IUB's arbitration order.

## IV. CONCLUSION

Upon the foregoing,

**IT IS ORDERED** the Iowa Utilities Board's November 28, 2005 Order on Rehearing is affirmed. Plaintiffs Iowa Telecom and Sprint have a duty to interconnect with Defendant Sprint under Section 251(a) of the Telecommunications Act because Sprint is a "telecommunications carrier." The parties' arbitrated interconnection agreement does not violate federal law. The Iowa Utilities Board did not exceed its jurisdiction in rehearing the case and rescinding its May 26, 2005 order.